**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X   **Docket No.:**   1:23-cv-00946
LORAINE FINDLEY,

Plaintiff,

- against -

CITY OF NEW YORK, NEW YORK CITY
HEALTH AND HOSPITAL CORP., HENRY J.
CARTER SPECIALTY HOSPITAL AND
NURSING HOME, HENRY J. CARTER, *In His
Individual and Official Capacities*, FLOYD
LONG, *In His Individual and Official Capacities*,
JEANETTE ROSARIO, *In Her Individual and
Official Capacities*, NYRON MCLEISH, *In His
Individual and Official Capacities*, DEBBIE
JACQUES, *In Her Individual and Official
Capacities*, JEAN-JACQUES BLITSTEIN, *in his
Individual and Official Capacities*, KAREN
ZEMSKY-CZIZIK, *In Her Individual and
Official Capacities*.

<u>**COMPLAINT**</u>

**PLAINTIFF DEMANDS
TRIAL BY JURY**

Defendants.
------------------------------------------------------------X

PLAINTIFF LORRAINE FINDLEY, by her attorneys, PHILLIPS & ASSOCIATES,

Attorneys at Law, PLLC, hereby complains of DEFENDANTS, upon information and belief, as

follows:

<u>**NATURE OF THE CASE**</u>

1.       PLAINTIFF complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified,

<u>42 U.S.C</u>. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of

1991, Pub. L. No. 102-166) ("Title VII"); <u>42 U.S.C.</u> §1983 ("Section 1983"); the

<u>Americans with Disabilities Act of 1990</u>, <u>42 U.S.C</u>. §§ 12101, *et seq*. ("<u>ADA</u>"); the

<u>Family Medical Leave Act</u> ("FMLA"); <u>New York State Human Rights Law</u>, <u>NYS

Executive Law</u> §§ 296, *et seq*. ("<u>NYSHRL</u>"); and <u>New York City Human Rights Law</u>,

New York City Administrative Code §§ 8-107, *et seq*. ("NYCHRL"); and seeks damages to redress the injuries PLAINTIFF suffered as a result of being **Discriminated against and Retaliated against (including Hostile Work Environment)** by DEFENDANTS solely due to her **Sex/Gender**, **Disabilities (whether actual and/or perceived)**, and **Retaliation for engagement in protected activity**.

2.    PLAINTIFF was employed as a "Client Navigator Level I" in the Patient Relations Department at DEFENDANT HENRY J. CARTER SPECIALTY HOSPITAL AND NURSING HOME, which is part of DEFENDANT CITY OF NEW YORK'S HEALTH AND HOSPITAL CORP., since in or around December 2015.

3.    PLAINTIFF worked without issue for three years until DEFENDANT HENRY J. CARTER, the namesake of the facility, began to sexually harass PLAINTIFF.

4.    Once PLAINTIFF finally gained the courage to complain about DEFENDANT HENRY J. CARTER, NYC DEFENDANTS began a systemic and ongoing campaign of retaliation against PLAINTIFF to try to force her out of her employment.

5.    In retaliation, among other things, NYC DEFENDANTS forced PLAINTIFF to be exposed to patient floors during the COVID-19 pandemic, causing PLAINTIFF to contract COVID-19 and to be put out on medical leave. DEFENDANTS then callously terminated PLAINTIFF from her employment, while she was out on medical leave, for failing to be vaccinated for COVID-19, despite having "Long COVID" at the time and being unable to vaccinate.

6.    To make matters worse, NYC DEFENDANTS wrongfully terminated PLAINTIFF when she needed her employment and health insurance the most - in violation of PLAINTIFF'S various rights as outlined below.

**JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES**

7.      Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), 42 U.S.C. §§ 12101, *et seq*., and 28 U.S.C. §§ 1331 and 1343.

8.      The Court has supplemental jurisdiction over the claims that PLAINTIFF has brought under State and City law pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more DEFENDANTS reside within the Southern District of New York, or the acts complained of occurred therein.

10.     By: (a) timely filing a Charge of Discrimination with the New York City Commission on Human Rights ("NYCCHR") on April 23, 2021, for her claims of Sexual Harassment and Retaliation (Case No. M-E-S—21-91076); (b) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 13, 2022, for her claims of Sexual Harassment/Discrimination, Disability Discrimination and Retaliation (Case No. 520-2021-04667); (c) receiving a Notice of Right to Sue from the EEOC on November 30, 2022, for her claims of Sexual Harassment/Discrimination, Disability Discrimination and Retaliation (Case No. 520-2021-04667); and (d) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (e) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, PLAINTIFF has satisfied all of the procedural prerequisites for the commencement of the instant action.

11.     A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

## PARTIES

12.     **PLAINTIFF LORRAINE FINDLEY ("PLAINTIFF")** is a 51-year-old female, who is a resident of the State of New York and County of Queens. PLAINTIFF was employed by DEFENDANT CITY OF NEW YORK as a "Client Navigator Level I" in DEFENDANT CITY OF NEW YORK'S HENRY J. CARTER SPECIALTY HOSPITAL AND NURSING HOME, from in or around December 2015 until on or about November 9, 2021, when she was unlawfully terminated from her employment.

13.     Since in or around December 2020, PLAINTIFF has been suffering from "Long COVID," and other disabilities related thereto, which are recognized disabilities under the laws.

14.     At all times relevant hereto, **DEFENDANT CITY OF NEW YORK (hereinafter, "DEFENDANT CITY")** is a municipal corporation, located within the State of New York.

15.     At all times relevant hereto, **NEW YORK CITY HEALTH AND HOSPITALS CORP. (hereinafter, "HHC")** is an agency of **DEFENDANT CITY**, which owns, operates, and manages public hospitals and healthcare facilities within the CITY.

16.     At all times relevant hereto, **HENRY J. CARTER SPECIALTY HOSPITAL AND NURSING HOME (hereinafter, "HJC")** is a healthcare facility and agency of **DEFENDANT CITY**, and/or HHC.

17.     **DEFENDANT HJC** is one of **DEFENDANT HHC'S** post-acute care facilities, which provides long-term acute and skilled nursing services for individuals who are physically disabled and medically fragile and who need specialized therapeutic support or

4

rehabilitative services. Upon information and belief, **DEFENDANT NYC** owns and/or operates HJC, which is located at 1752 Park Avenue, New York, New York 10035, where the discriminatory conduct took place.

18.   **DEFENDANTS, CITY, HHC, and HJC,** are collectively referred to herein as **"NYC DEFENDANTS."**

19.   **NYC DEFENDANTS** employ well-more than 15 employees.

20.   At all times relevant, **DEFENDANT HENRY J. CARTER (hereinafter, "DEFENDANT CARTER"**) is the namesake of DEFENDANT HJC. DEFENDANT CARTER has the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT CARTER is being sued herein in his individual and official capacities.

21.   DEFENDANT CARTER is the founder of Wheelchair Charities, Inc. and is the namesake of DEFENDANT HJC, in recognition of his over four decades of support to New Yorkers with disabilities and more than $25 million in donations to DEFENDANT HHC.

22.   At all times relevant, **DEFENDANT FLOYD LONG (hereinafter, "DEFENDANT LONG")** is/was a "Chief Operating Officer" of DEFENDANT HJC. DEFENDANT LONG was one of PLAINTIFF'S managers/supervisors and had the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT LONG is being sued herein in her individual and official capacities.

23.   At all times relevant, **DEFENDANT JEANETTE ROSARIO (hereinafter, "DEFENDANT ROSARIO")** is/was a "Director of Patient Relations" of DEFENDANT HJC. DEFENDANT ROSARIO was one of PLAINTIFF'S managers/supervisors and had

the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT ROSARIO is being sued herein in her individual and official capacities.

24.     At all times relevant, **DEFENDANT NYRON MCLEISH (hereinafter, "DEFENDANT MCLEISH")** is/was a "Assistant Director of Patient Relations" of DEFENDANT HJC. DEFENDANT MCLEISH was one of PLAINTIFF'S managers/supervisors and had the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT MCLEISH is being sued herein in her individual and official capacities.

25.     At all times relevant, **DEFENDANT DEBBIE JACQUES (hereinafter, "DEFENDANT JACQUES")** is/was a "Leave Administrator" of DEFENDANT HJC. DEFENDANT JACQUES was one of PLAINTIFF'S managers/supervisors and had the ability to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT JACQUES is being sued herein in his/her individual and official capacities.

26.     At all times relevant, **DEFENDANT JEAN-JACQUES BLITSTEIN (hereinafter, "DEFENDANT BLITSTEIN")** is/was the "Director of Labor Relations" at DEFENDANT HHC. As the Director of Labor Relations, DEFENDANT BLITSTEIN had the ability to affect the terms and conditions of PLAINTIFF'S employment, including termination. DEFENDANT BLITSTEIN is being sued herein in his/her individual and official capacities.

27.     At all times relevant, **DEFENDANT KAREN ZEMSKY-CZIZIK (hereinafter, "DEFENDANT ZEMSKY-CZIZIK")** is/was a "Director of Human Resources for Post-Acute Care" of DEFENDANT HJC. DEFENDANT ZEMSKY-CZIZIK was one of PLAINTIFF'S managers/supervisors and had the ability to affect the terms and

conditions of PLAINTIFF'S employment. DEFENDANT ZEMSKY-CZIZIK is being sued herein in his/her individual and official capacities.

28. **DEFENDANTS, CARTER, LONG, ROSARIO, MCLEISH, JACQUES, and ZEMSKY-CZIZIK**, will collectively be referred to herein as **"INDIVIDUAL DEFENDANTS."**

29. **DEFENDANTS, NYC, CARTER, LONG, ROSARIO, MCLEISH, JACQUES, and ZEMSKY-CZIZIK**, will collectively be referred to herein as **"NYC DEFENDANTS."**

30. **DEFENDANTS, NYC, CARTER, LONG, ROSARIO, MCLEISH, JACQUES, ZEMSKY-CZIZIK,** will collectively be referred to herein as "**COLLECTIVE DEFENDANTS**."

## MATERIAL FACTS

31. On or about March 15, 2015, PLAINTIFF began her employment with DEFENDANT, CITY and HHC, as a temporary employee, through a staffing agency.

32. In or around May 2015, PLAINTIFF applied for and was offered an official position with DEFENDANTS, CITY and HHC, at the HENRY J. CARTER facility.

33. On or about December 7, 2015, PLAINTIFF began her direct employment with NYC DEFENDANTS as a "Client Navigator Level I."

34. PLAINTIFF regularly worked Sunday through Thursday from 3:00 p.m. to 11:00 p.m., on average approximately 40 hours per week, and earned a salary of $45,098.00.

35. PLAINTIFF had an expected 2022 annual income of $45,098.00, plus the value of her benefits, which includes but is not limited to: Vision Insurance, Dental Insurance, Medical Insurance, Pension, Prudential TDA, NYC 457 Deferred-Compensation, Short-Term Disability, and Whole Life Insurance for PLAINTIFF and her family.

36.     At all times relevant, PLAINTIFF performed the functions of her employment in an above-satisfactory manner and was never written-up or disciplined as a result of her job performance.

37.     PLAINTIFF was qualified to perform the duties of her employment.

38.     PLAINTIFF worked without issue until in or around 2018.

**PLAINTIFF'S Sex/Gender and Sexual Harassment Claims**.

39.     In or around early 2016, DEFENDANT CARTER came to DEFENDANT HJC and introduced himself to PLAINTIFF.

40.     DEFENDANT CARTER visited DEFENDANT HJC on an almost daily basis and made it a point to speak to PLAINTIFF when he would visit same.

41.     Thinking nothing of it, PLAINTIFF would engage in small-talk with DEFENDANT CARTER to be respectful to the namesake.

42.     On one of these days, in or around Spring 2016, DEFENDANT CARTER provided PLAINTIFF with his cell phone number under the guise that a very important person was coming to visit him at DEFENDANT HJC and that he wanted PLAINTIFF to call him if that person came.

43.     However, no "very important person" came to DEFENDANT HJC.

44.     This type of conduct occurred a few more times, throughout the years, but no one ever showed up.

45.     Upon information and belief, DEFENDANT CARTER wanted PLAINTIFF to have his direct cell phone number.

46.     In or around late 2016, DEFENDANT CARTER told PLAINTIFF that he was responsible for DEFENDANT ROSARIO getting her job and if DEFENDANT

ROSARIO caused any problems for PLAINTIFF, PLAINTIFF should let DEFENDANT CARTER know.

47. Upon information and belief, this was the first instance where DEFENDANT CARTER informed PLAINTIFF that he had power to control the terms and/or conditions of the employees' who worked at DEFENDANT HJC.

48. In addition, on multiple occasions in or around 2016, DEFENDANT CARTER would leave his belongings with PLAINTIFF and told her to watch his property, despite him and his son both having offices at DEFENDANT HJC.

49. On another occasion, in or around the fall of 2016, during hospital police shift change, DEFENDANT CARTER approached PLAINTIFF, while she tried to appear busy to avoid DEFENDANT CARTER.

50. DEFENDANT CARTER then asked PLAINTIFF if she was okay, to which PLAINTIFF responded yes.

51. But then, all of a sudden, without knowledge or consent from PLAINTIFF, DEFENDANT CARTER approached PLAINTIFF from behind and began to stroke her cheek with the back of his hand.

52. Almost immediately, Monserrate (Monsy) Nieves-Martinez ("Ms. Martinez"), (then) Senior Associate Director, called DEFENDANT CARTER over to her in a stern manner.

53. Upon information and belief, Ms. Martinez saw what DEFENDANT CARTER was doing, and saw that PLAINTIFF looked uncomfortable, and maneuvered him away from PLAINTIFF.

54. From in or around early 2017 until in or around 2019, DEFENDANT CARTER sexually harassed PLAINTIFF on many occasions in different ways.

55.   Then, once PLAINTIFF began complaining to DEFENDANTS ROSARIO and
MCLEISH, they began to subject PLAINTIFF to a hostile work environment and a
campaign of retaliation against PLAINTIFF for complaining about their namesake,
DEFENDANT CARTER.

56.   On several occasions, from in or around 2017 until in or around 2019, when others were
not present, DEFENDANT CARTER would come up behind PLAINTIFF, while she was
sitting at her desk, and touch her, by stroking her cheeks with his hands or touching her
neck.

57.   On each and every one of these occasions, PLAINTIFF would immediately reject
DEFENDANT CARTER'S unwanted and unlawful touching.

58.   PLAINTIFF initially did not complain about DEFENDANT CARTER as she feared
retaliation.

59.   On multiple occasions, in or around 2017, DEFENDANT CARTER would stand behind
PLAINTIFF and greet visitors, while he stroked the back of PLAINTIFF'S neck.

60.   PLAINTIFF was offended on each and every one of these occasions, as she did not feel
comfortable with DEFENDANT CARTER touching her in this manner.

61.   On other occasions, throughout 2017, when DEFENDANT CARTER was retrieving his
belongings, from PLAINTIFF'S desk, he would caress PLAINTIFF'S cheek with the
back of his hand.

62.   On these occasions, PLAINTIFF immediately shifted her chair to move away from
DEFENDANT CARTER.

63.   In or around Late 2017, PLAINTIFF complained to DEFENDANT JACQUES about
DEFENDANT CARTER.

64.   During this meeting, PLAINTIFF complained about DEFENDANT CARTER rubbing PLAINTIFF'S check and back of her neck.

65.   DEFENDANT JACQUES responded that DEFENDANT CARTER was in the wrong and directed PLAINTIFF to speak with David Smart ("Mr. Smart"), DEFENDANT HHC'S EEO Officer, located at Woodhull Hospital.

66.   When PLAINTIFF met with Mr. Smart, she tried to explain what DEFENDANT CARTER was doing to her, but after a short discussion, Mr. Smart told PLAINTIFF that he could not do anything, unless it was *"a domestic violence situation."*

67.   Mr. Smart continued that PLAINTIFF needed to speak to Human Resources at DEFENDANT HJC and referred PLAINTIFF back to Human Resources at HJC.

68.   Between in or around January 2018 and in or around October 2018, DEFENDANT CARTER came to DEFENDANT HJC and would sit near PLAINTIFF and greet patients and introduce himself as the namesake of the hospital.

69.   In or around Summer 2018, PLAINTIFF was attending to a visitor, who came to visit a family member at DEFENDANT HJC.

70.   When the visitor complimented PLAINTIFF, DEFENDANT CARTER jumped up from where he was sitting and yelled "***that's my wife, that's my wife***!"

71.   PLAINTIFF and the visitor were both shocked by DEFENDANT CARTER'S conduct, especially PLAINTIFF because the statement was not true.

72.   The visitor immediately began apologizing to DEFENDANT CARTER stating that he did not know PLAINTIFF was DEFENDANT CARTER'S wife.

73.   Before the visitor walked away, PLAINTIFF turned around towards DEFENDANT CARTER and asked him why he would say such a thing, since it was untrue.

74.  DEFENDANT CARTER did not respond.

75.  Upon information and belief, DEFENDANT CARTER was trying to show that he could exert control over PLAINTIFF, and who she could and could not speak to.

76.  In or around 2018, PLAINTIFF complained to Michelle Smith ("Ms. Smith"), Health Information Management ("HIM") Director, about DEFENDANT CARTER.

77.  Ms. Smith responded that PLAINTIFF should call a lawyer because what PLAINTIFF was experiencing was workplace violence and a hostile work environment.

78.  Ms. Smith continued that PLAINTIFF should seek other employment.

79.  On multiple occasions, in or around Summer 2018, DEFENDANT CARTER regularly sat at PLAINTIFF'S desk, stretched over her to reach her phone, and/or leaned on her desk, while using her phone.

80.  This activity made PLAINTIFF uncomfortable.

81.  In or around May 2018, PLAINTIFF complained to Karen Miller ("Ms. Miller"), Safety Director, about DEFENDANT CARTER.

82.  In or around October 2018, DEFENDANT CARTER came to DEFENDANT HJC, dressed in a suit, and sat on a sofa behind PLAINTIFF.

83.  On this particular day, DEFENDANT CARTER was wearing a bowtie.

84.  A few minutes later, DEFENDANT CARTER loudly called for PLAINTIFF, stating, "***Baby come here. Baby, come here!***."

85.  At first, PLAINTIFF ignored DEFENDANT CARTER, unsure of who he was speaking to.

86.  Then, DEFENDANT CARTER specified, *"**Loraine, come here!...**"*

87.  When PLAINTIFF walked over to DEFENDANT CARTER, she found him with his

bowtie undone.

88.   DEFENDANT CARTER laid back in the chair and continued, "*…Tie my tie*."

89.   PLAINTIFF promptly responded, "*I can't do that…No, I can't tie your tie*," before

walking away from DEFENDANT CARTER and sitting back down at her desk.

90.   Approximately 10 minutes later, DEFENDANT CARTER came up to PLAINTIFF and

told her "*I'm upset with you. You could have at least tried*."

91.   PLAINTIFF responded that she would not tie his tie and he should ask someone else.

92.   Sometime later, DEFENDANT CARTER came up behind PLAINTIFF and yanked on

her hair and/or ponytail.

93.   PLAINTIFF screamed in pain, turned around and asked DEFENDANT CARTER why he

just pulled her hair.

94.   DEFENDANT CARTER did not respond and walked away towards the restroom.

95.   PLAINTIFF was extremely upset at DEFENDANT CARTER'S ongoing harassment and

inappropriate behavior.

96.   PLAINTIFF complained to Ms. Miller that she could not handle DEFENDANT

CARTER anymore and that PLAINTIFF wanted to report him.

97.   In response, Ms. Miller said that PLAINTIFF *"needed to be careful because

administration would team up against"* PLAINTIFF because DEFENDANT CARTER

*"is keeping HJC open."*

98.   PLAINTIFF understood this fact, and also knew that a complaint against DEFENDANT

CARTER would cause trouble for PLAINTIFF – as opposed to DEFENDANT

CARTER.

99.   Later that day, at or around 6 PM, PLAINTIFF complained directly to DEFENDANT

MCLEISH.

100. PLAINTIFF complained to DEFENDANT MCLEISH about the prior day's events, and also about what had transpired over the last ten (10) months.

101. DEFENDANT MCLEISH coldly responded, "*Oh boy. I don't even want to talk to him about this. If you try to do something about this, the whole facility might turn against you. They will take his side*."

102. In no uncertain terms, DEFENDANT MCLEISH made clear to PLAINTIFF that her complaints to anyone at NYC DEFENDANTS would be futile.

103. DEFENDANT MCLEISH then advised PLAINTIFF to confront DEFENDANT CARTER directly in an area where surveillance cameras would capture the interaction.

104. PLAINTIFF told DEFENDANT MCLEISH that she was willing to confront DEFENDANT CARTER but feared retaliation.

105. DEFENDANT MCLEISH replied, in sum and substance, "*You give me no option but to report it. I will talk to Mr. Long and have it reported*."

106. However, DEFENDANTS MCLEISH, LONG, nor ROSARIO, followed up with PLAINTIFF about her complaint about DEFENDANT CARTER.

107. Soon thereafter, all of a sudden, DEFENDANTS MCLEISH and ROSARIO began to exclude PLAINTIFF from weekly team meetings by rescheduling them outside of PLAINTIFF'S regular hours, in retaliation for PLAINTIFF complaining about DEFENDANT CARTER.

108. DEFENDANT LONG also began to ignore and avoid PLAINTIFF, in retaliation for PLAINTIFF complaining about DEFENDANT CARTER.

109. This was a contrast to DEFENDANT LONG'S prior conduct, where he would always

stop and speak with PLAINTIFF when he passed her desk, and on occasion, asked for her assistance with some of his tasks.

110.   PLAINTIFF'S access to the Patient Relations Office was also limited to the main area, where PLAINTIFF signed in for work.

111.   This contrasted with PLAINTIFF'S prior access to all three office spaces, including the supply office/Navigator's Office.

112.   A few days later, DEFENDANT CARTER came up to PLAINTIFF and told her "*I love loyalty*."

113.   In addition, a few days later, DEFENDANT CARTER came up to PLAINTIFF again and told her "*Central office listens to me about who gets hired and who gets fired*."

114.   DEFENDANT CARTER was thereby bragging about his ability to affect the terms and conditions of PLAINTIFF'S employment with NYC DEFENDANTS.

115.   A few weeks later, DEFENDANT CARTER returned to PLAINTIFF'S desk, sat down at the edge of her desk, and stared at PLAINTIFF for several minutes before getting up and walking away.

116.   This action had no good faith business purpose and was extremely intimidating and harassing to PLAINTIFF.

117.   DEFENDANT CARTER did so to show PLAINTIFF that he could do whatever he wanted, whenever he wanted and meant to intimidate PLAINTIFF.

118.   Later that day, PLAINTIFF complained to DEFENDANT MCLEISH about DEFENDANT CARTER'S conduct.

119.   PLAINTIFF clearly told DEFENDANT MCLEISH that DEFENDANT CARTER'S conduct was inappropriate and made her feel uncomfortable.

120.　DEFENDANT MCLEISH, rudely laughed, and responded, "***I don't know what is wrong with that guy***."

121.　Upon information and belief, based on DEFENDANT MCLEISH'S dismissive response, DEFENDANT MCLEISH did not report PLAINTIFF'S complaint to his superiors.

122.　On another occasion, in or around Winter 2018, DEFENDANT CARTER asked PLAINTIFF to tally checks that he was donating to DEFENDANT HJC.

123.　There was no reason (good faith or otherwise) to place checks in front of PLAINTIFF or ask PLAINTIFF to count same. Counting checks was not PLAINTIFF'S duty or responsibility.

124.　PLAINTIFF did so on the first occasion, but on the second occasion when she was asked, she refused because she believed that DEFENDANT CARTER was trying to show PLAINTIFF how much money he had.

125.　In or around February 2019, PLAINTIFF complained to Kathy McLean ("Ms. McLean"), Human Resources Employee, about DEFENDANT CARTER.

126.　During this meeting, PLAINTIFF complained about how DEFENDANT CARTER inappropriately touched her, that DEFENDANT MCLEISH, VIERA, AND ROSARIO retaliated against her for reporting DEFENDANT CARTER, and that DEFENDANT ROSARIO'S husband and hospital sergeant police officer at DEFENDANT HJC, James Alago ("Mr. Alago") called PLAINTIFF a "head case" and other derogatory names during roll calls in retaliation for her complaints.

127.　In response, Ms. McLean provided PLAINTIFF with the contact information for the Compliance Department and the Inspector General's Office.

128.　In or around July 2019, PLAINTIFF called Petal Martindale ("Ms. Martindale"),

Compliance Officer.

129. During this call, PLAINTIFF complained to Ms. Martindale about the ongoing sexual harassment and retaliation PLAINTIFF was experiencing by DEFENDANTS CARTER, ROSARIO, MCLEISH, and VIEIRA.

130. PLAINTIFF later learned that Ms. Martindale visited DEFENDANT HJC and spoke with the individuals PLAINTIFF mentioned to her (Ms. Martindale), as well as other employees, about PLAINTIFF'S complaint.

131. In or around late July or August 2019, rather than follow up with PLAINTIFF about her complaint, Ms. Martindale called PLAINTIFF to ask PLAINTIFF if she saw any employees drinking on the job.

132. Ms. Martindale never updated PLAINTIFF about PLAINTIFF'S complaints.

133. On another occasion in or around May/June 2019, DEFENDANT CARTER placed his wallet on PLAINTIFF'S desk, and told PLAINTIFF to *"watch it for me."*

134. PLAINTIFF immediately responded that she would not, and did not want to, watch it.

135. However, DEFENDANT CARTER ignored PLAINTIFF and continued to walk away, while claiming that he trusted her to watch his wallet.

136. There was no good faith business justification or reason for DEFENDANT CARTER to place his personal wallet in front of PLAINTIFF, or to ask PLAINTIFF to "watch it."

137. Upon information and belief, like the donation checks DEFENDANT CARTER wanted PLAINTIFF to tally, DEFENDANT CARTER just wanted PLAINTIFF to see how much money he had in his wallet.

138. In the alternative, DEFENDANT CARTER was trying to entice PLAINTIFF to go into his wallet, so he could accuse her of wrongdoing.

139. PLAINTIFF was made to be very uncomfortable by this action and refused to touch the wallet.

140. DEFENDANT CARTER did not subject any male employees to these requests and/or behavior.

141. In or around Summer 2019, PLAINTIFF complained to Yasmin Hakeem Abdul ("Ms. Abdul"), Hospital Police Officer, about DEFENDANT CARTER'S ongoing harassment.

142. While, PLAINTIFF was working with Ms. Abdul, DEFENDANT CARTER came up to PLAINTIFF'S desk and dropped off his bag before walking away.

143. Once DEFENDANT CARTER walked away, PLAINTIFF and Ms. Abdul were bewildered by DEFENDANT CARTER'S actions because he had no reason to drop his bag at PLAINTIFF'S workstation.

144. On or about July 8, 2019, PLAINTIFF arrived at work and noticed that there was a new chair at her workstation.

145. About twenty minutes later, while PLAINTIFF was sitting in the new chair, PLAINTIFF'S chair suddenly dropped down without any action by PLAINTIFF.

146. The next day, on or about July 9, 2019, PLAINTIFF'S chair suddenly swung PLAINTIFF forward thrusting her into her desk. Obviously, the chair was malfunctioning.

147. PLAINTIFF called and complained to management about the "new" chair malfunctioning.

148. The next day, on July 10, 2019, PLAINTIFF filed an incident report with the Occupational Health Department because she began to feel sharp pains in her back due to the malfunctioning chair.

149.   When PLAINTIFF brought the report to DEFENDANT ROSARIO, DEFENDANT
ROSARIO told PLAINTIFF that PLAINTIFF'S alleged pain was "***bullshit,***" that nothing
was wrong with the chair, and she refused to fill out the incident report.

150.   DEFENDANT ROSARIO then called Hospital Police and the Associate Director to tell
them that PLAINTIFF wanted to file an incident report about PLAINTIFF'S faulty chair.

151.   DEFENDANT ROSARIO then called Sandra Keller ("Ms. Keller"), in Occupational
Health, and refused to fill out PLAINTIFF'S incident report.

152.   As a result, PLAINTIFF'S incident report was rejected by the Operational Health
Department.

153.   Soon thereafter, PLAINTIFF filed a complaint/grievance with her Union.

154.   However, when PLAINTIFF had her meeting with Rhonda Richardson ("Ms.
Richardson"), Labor Relations Employee, DEFENDANT ROSARIO, and Mr. Williams,
Ms. Richardson informed PLAINTIFF that the Director of Operational Health wrongly
claimed that PLAINTIFF refused treatment on the day of the incident.

155.   On or about July 10, 2019, Ms. Miller came up to PLAINTIFF, and told PLAINTIFF that
*"they"* sent Ms. Miller "***to do their dirty work***" and bring a paper for PLAINTIFF to
sign. The PAPER falsely indicated that PLAINTIFF flipped her own chair.

156.   Upon information and belief, "they" was DEFENDANT ROSARIO.

157.   Ms. Miller also told PLAINTIFF that DEFENDANT ROSARIO was involved in writing
up the false statement for PLAINTIFF to sign.

158.   PLAINTIFF upset, went to Ms. Saint Louis to discuss the statement. However, Ms. Saint
Louis denied knowledge of the statement and simply gave PLAINTIFF a different chair.

159.   On or about July 14, 2019, when DEFENDANT ROSARIO noticed that PLAINTIFF had

a new chair, DEFENDANT ROSARIO went to the Hospital Police office and began to monitor PLAINTIFF'S movement that day.

160. Throughout the day, hospital police employees repeatedly told PLAINTIFF that DEFENDANT ROSARIO was monitoring PLAINTIFF'S every move.

161. On or about July 15, 2019, DEFENDANT ROSARIO called DEFENDANT LONG and told him to remove PLAINTIFF'S new chair.

162. DEFENDANT LONG removed PLAINTIFF'S new chair as a result.

163. When PLAINTIFF came to work, noticing that her chair was switched, PLAINTIFF promptly retrieved her chair and began working.

164. However, approximately five minutes later, DEFENDANT ROSARIO, DEFENDANT MCLEISH, and a hospital police employee, came to PLAINTIFF and forcefully took her chair away.

165. DEFENDANTS brought hospital police to PLAINTIFF as if she were a criminal for needing and taking a chair to use for work.

166. DEFENDANTS ROSARIO and MCLEISH intended to harass PLAINTIFF in further retaliation for her engagement in protected activity.

167. There was no good faith reason to force PLAINTIFF to sit in a malfunctioning chair other than to harass and annoy PLAINTIFF, and to make her workday uncomfortable.

168. On or about July 25, 2019, Ms. Abdul called PLAINTIFF and told her that DEFENDANT ROSARIO wanted Ms. Abdul to write a false statement that PLAINTIFF was discussing patient information on speaker phone with DEFENDANT ROSARIO.

169. Ms. Abdul further advised PLAINTIFF she refuse to provide a false statement to DEFENDANT ROSARIO.

170.   In or around Late-July 2019, Victor Hart ("Mr. Hart"), an Assistant Director at DEFENDANT HHC, came up to PLAINTIFF and asked her *"why [he needed] to investigate"* PLAINTIFF.

171.   Confused, PLAINTIFF replied that if Mr. Hart needed to investigate her, he could. Mr. Hart did not respond and simply walked away.

172.   Starting in or around the Summer 2019, PLAINTIFF'S coworkers, Mr. Alago and Eboni Hicks ("Ms. Hicks"), DEFENDANT CARTER'S cousin and Sergeant Police at Defendant HHC, repeatedly insulted PLAINTIFF by calling her, among other things: "**head case**," "**pain in the ass**," and "**bitch**."

173.   On or about August 4, 2019, Ms. Miller informed PLAINTIFF that DEFENDANT ROSARIO was trying to get Ms. Miller to write a false statement against PLAINTIFF.

174.   When Ms. Miller refused, DEFENDANT ROSARIO tried to make DEFENDANT LONG force Ms. Miller to write the statement.

175.   It was clear that DEFENDANT ROSARIO was trying to create a false paper trail against PLAINTIFF to have her (wrongfully) disciplined and/or terminated.

176.   On or about October 2, 2019, a male employee of Northwell Hospital lab (the "Northwell Employee") came to pick up a specimen. PLAINTIFF directed the Northwell Employee to the correct office to retrieve the specimen because the employee had the wrong information and there was confusion about what location he was supposed to report to.

177.   Later that day, PLAINTIFF explained to DEFENDANTS, ROSARIO and MCLEISH, that the Northwell Employee came to pick up a specimen, and about the issues related to that incident.

178.   For this seemingly simple and routine incident, wherein PLAINTIFF did her job and

directed the employee to the correct location, DEFENDANTS MCLEISH and ROSARIO sought statements from hospital police and other employees in an attempt to find a reason to discipline PLAINTIFF.

179. PLAINTIFF was advised by hospital police that DEFENDANTS MCLEISH and ROSARIO wanted them to write-up a report on PLAINTIFF for disciplinary purposes.

180. Specifically, late November 2019, a Hospital Police Officer named "Officer Bruno" confirmed that DEFENDANT ROSARIO and members of his department were *"pressuring"* him to write a report against PLAINTIFF.

181. This was also retaliatory.

182. DEFENDANTS MCLEISH and ROSARIO sought to build a paper trail on PLAINTIFF because she engaged in protected activity and complained about sexual harassment.

183. On or about October 7, 2019, PLAINTIFF emailed Maureen McClusky ("Ms. McClusky"), (now Former) Senior Vice President for Post-Acute Care, with the subject line "Unbearable working situations at Henry J. Carter" complaining about discrimination, harassment, and retaliation PLAINTIFF was facing at work. (Hereinafter, the "October 7, 2019 Email").

184. In this email, PLAINTIFF described her work environment as a "nightmare."

185. Immediately after PLAINTIFF'S complaint to Ms. McClusky, on or about October 8, 2019, PLAINTIFF received an email from DEFENDANT ROSARIO, with Labor Relations copied on it, asking PLAINTIFF for an incident report about what happened with the Northwell (specimen collecting) Employee on October 2, 2019.

186. On or about October 9, 2019, PLAINTIFF submitted her response to DEFENDANT ROSARIO, Mr. Williams, and DEFENDANT BLITSTEIN, the Labor Relations Director

at DEFENDANT HHC, about what transpired on October 2, 2019.

187. On or about October 16, 2019, PLAINTIFF met with DEFENDANT ZEMSKY-CZIZIK, and Orlando Acosta ("Mr. Acosta"), Assistant Director for Human Resources, about the October 7, 2019, Email.

188. During this meeting, PLAINTIFF complained to them about DEFENDANT CARTER, the broken chair situation from July 2019, and about the ongoing retaliatory activity of DEFENDANTS, ROSARIO, MCLEISH, and LONG.

189. DEFENDANT ZEMSKY-CZIZIK immediately dismissed and/or ignored PLAINTIFF'S complaint against Ms. Vieira and DEFENDANT MCLEISH.

190. DEFENDANT ZEMSKY-CZIZIK then told PLAINTIFF that PLAINTIFF should speak to DEFENDANT ROSARIO directly about their ongoing issues.

191. As for the chair complaint, DEFENDANT ZEMSKY-CZIZIK then excused DEFENDANT LONG for removing PLAINTIFF'S chair claiming that DEFENDANT LONG (allegedly) "*wanted the lobby to look nice*."

192. Interestingly, DEFENDANT ZEMSKY-CZIZIK had immediate excuses to explain-away all of PLAINTIFF'S complaints, without any investigation whatsoever.

193. PLAINTIFF then complained about her job evaluation and how DEFENDANT ROSARIO marked it up. However, when DEFENDANT ZEMSKY-CZIZIK showed it to PLAINTIFF, all of a sudden, there were no markups.

194. PLAINTIFF also complained about being denied trainings, even though the trainings were supposed to occur on PLAINTIFF'S own time.

195. However, DEFENDANT ZEMSKY-CZIZIK dismissed PLAINTIFF'S complaint of lack of training and claimed that PLAINTIFF would be afforded any training she wanted in

the future, going forward.

196. But DEFENDANT ZEMSKY-CZIZIK outright ignored PLAINTIFF'S claims about being denied training in the past.

197. PLAINTIFF then complained about DEFENDANT CARTER'S sexual harassment; about him visiting PLAINTIFF'S desk and rubbing his hand on her check and back of her neck; about CARTER pulling PLAINTIFF'S hair and leaving his property at PLAINTIFF'S desk for her to watch.

198. PLAINTIFF continued that she complained to DEFENDANT MCLEISH, who said he would speak to DEFENDANT LONG. However, no one followed up with PLAINTIFF.

199. Then, PLAINTIFF complained that DEFENDANT CARTER returned to her desk and threatened PLAINTIFF'S employment by saying that the central office listens to him, about who gets hired and who gets fired.

200. PLAINTIFF continued that the situation was affecting her ability to do her job, and that PLAINTIFF was going to file a report with the EEO.

201. In response, DEFENDANT ZEMSKY-CZIZIK gave PLAINTIFF a card for internal EEO and told PLAINTIFF whenever PLAINTIFF was ready to speak with them, PLAINTIFF should let her know.

202. Under DEFENDANT NYC'S, HJC'S and HHC'S policies, DEFENDANT ZEMSKY-CZIZIK and the other managers/supervisors that were aware of PLAINTIFF'S discrimination and sexual harassment complaints, had an obligation to forward PLAINTIFF'S complaints to the EEO.

203. DEFENDANT ZEMSKY-CZIZIK, as the Director of HR, knew and should have known that the time to take PLAINTIFF'S complaint, and/or to direct PLAINTIFF to the proper

people to take her complaint (if not DEFENDANT ZEMSKY-CZIZIK) was right then and there, when DEFENDANT ZEMSKY-CZIZIK became aware of PLAINTIFF'S concerns.

204. DEFENDANT ZEMSKY-CZIZIK outright ignored her obligations under NYC DEFENDANTS' anti-sexual harassment policies.

205. As PLAINTIFF intended to make a complaint against her direct supervisors and management, PLAINTIFF was intimidated to make the formal EEO complaint because she feared retaliation based on her experiences.

206. DEFENDANT ZEMSKY-CZIZIK handed PLAINTIFF the EEO'S card in front of everyone and told PLAINTIFF to make the call to the EEO in further effort to intimidate PLAINTIFF.

207. DEFENDANT ZEMSKY-CZIZIK told PLAINTIFF to *"let her know"* whenever PLAINTIFF intended to make a complaint to the EEO as a further means to intimidate PLAINTIFF.

208. PLAINTIFF did not have an obligation to *"let"* DEFENDANT ZEMSKY-CZIZIK *"know"* when PLAINTIFF was intending to make an EEO complaint. Indeed, DEFENDANT ZEMSKY-CZIZIK was made aware of PLAINTIFF'S complaint(s) right there, and refused to take action in response thereto.

209. DEFENDANT ZEMSKY-CZIZIK gave PLAINTIFF the option to make a formal complaint when DEFENDANT ZEMSKY-CZIZIK did not have any option (under DEFENDANTS' policies) and was obligated to take PLAINTIFF'S EEO complaint or direct PLAINTIFF to the right place to do so.

210. DEFENDANT ZEMSKY-CZIZIK'S conduct toward PLAINTIFF during the meeting

was of the sort that would dissuade any reasonable employee from making a complaint of discrimination, sexual harassment, hostile work environment or retaliation.

211. In or around June 2020, PLAINTIFF met with DEFENDANT BLITSTEIN because PLAINTIFF was experiencing headaches and depression on a daily basis, due to the ongoing hostile work environment.

212. During PLAINTIFF'S meeting with DEFENDANT BLITSTEIN, PLAINTIFF complained that DEFENDANT CARTER was sexually harassing PLAINTIFF and that DEFENDANTS MCLEISH, ROSARIO, and VIERA was retaliating against her for complaint about DEFENDANT CARTER'S conduct.

213. However, DEFENDANT BLITSTEIN cut PLAINTIFF off and told PLAINTIFF that it was best that she did not to get into any details with him because whatever she says to him could be used against her.

214. Again, DEFENDANT BLITSTEIN, a manager at DEFENDANT HHC/HJC, had an obligation to forward PLAINTIFF'S complaint to HR and/or the person/group charged with the responsibility of taking discrimination complaints.

215. DEFENDANT BLITSTEIN, like everyone else, dismissed PLAINTIFF'S complaint and told her that her complaints could be used against her.

216. PLAINTIFF could not understand how her sexual harassment and retaliation complaints could be "used against her," but this further reinforced the thought in PLAINTIFF'S mind that she would face retaliation for making a formal complaint.

217. Much like DEFENDANT ZEMSKY-CZIZIK, DEFENDANT BLITSTEIN had an obligation under HHC'S/HJC'S policies to forward PLAINTIFF'S complaints to the proper channels for evaluation and refused to do so.

218.  DEFENDANT BLITSTEIN'S conduct was also of the type that would dissuade a reasonable employee from making discrimination complaints.

**PLAINTIFF'S Disability Discrimination and Retaliation Claims**

219.  Even worse, after being discriminated against, sexually harassed, and retaliated against as a result of DEFENDANT CARTER'S unlawful conduct, NYC DEFENDANTS subjected PLAINTIFF to further discrimination, harassment, and retaliation due to PLAINTIFF'S disabilities (Long COVID) and in further retaliation for PLAINTIFF'S discrimination complaints.

220.  In or around March 2020, the COVID-19 Pandemic hit New York City.

221.  In order to control employee exposure during the pandemic, only patient-facing personnel (such as doctors and nurses) were allowed to, or required, to go to floors that were designated "COVID Floors," wherein only patients infected with COVID-19 were admitted and treated.

222.  However, in or around April 2020, DEFENDANTS ROSARIO and MCLEISH, intentionally changed PLAINTIFF'S schedule to require PLAINTIFF to go from floor to floor, and room to room, on both sides of DEFENDANT HJC.

223.  PLAINTIFF was singled-out and DEFENDANTS required PLAINTIFF to go to mostly, if not all, of the COVID-19 floors and rooms, while the other similarly-situated non-clinical staff members were not required to go to these rooms.

224.  Given the significant positivity rates at the time, DEFENDANT HJC designated specific wards for COVID-19 positive patients.

225.  However, throughout April and May 2020, PLAINTIFF was instructed to go to designated COVID-19 quarantine floors to do facetime with patient's family members.

226.  Not only was this not necessary, but DEFENDANTS were also putting PLAINTIFF at unnecessary risk of catching COVID-19, unlike her similarly situated coworkers.

227.  On or about May 11, 2020, seeing that she was the only non-clinical employee being sent to these floors, PLAINTIFF inquired with DEFENDANT MCLEISH about being singled-out and assigned to COVID floors.

228.  In response, as PLAINTIFF was aware, DEFENDANT MCLEISH told PLAINTIFF that no non-clinical staff should be going to the quarantine floors.

229.  Nevertheless, PLAINTIFF was still being sent to these floors.

230.  DEFENDANTS either intended to cause PLAINTIFF to quit, or DEFENDANTS intended to force PLAINTIFF to become ill with COVID-19, in continued retaliation.

231.  DEFENDANTS had no good faith business justification for ordering PLAINTIFF to do video calls with patients on these quarantined floors.

232.  NYC DEFENDANTS were requiring PLAINTIFF to go to the COVID-19 wards in retaliation for her complaints against DEFENDANT CARTER.

233.  PLAINTIFF obeyed the orders because she did not want to be disciplined for insubordination. But, PLAINTIFF was in fear and was anxious about her health and safety.

234.  On or about May 26, 2020, PLAINTIFF was provided with a list of COVID patients to do video calls with.

235.  Later that day, DEFENDANTS ROSARIO and DEFENDANT MCLEISH sent PLAINTIFF to the 7th Floor (a COVID-19 wing) to *"help the nurses"* when PLAINTIFF was done with her video calls that day.

236.  However, upon information and belief, the 7th floor was off limits for non-clinical staff

from every department (except PLAINTIFF, apparently).

237. None of these instructions had any good faith basis and DEFENDANTS were trying to cause PLAINTIFF severe emotional distress.

238. In fact, an employee named "Mr. Heaven," who was another navigator like PLAINTIFF, as well as Rehabilitation and dietary employee, was instructed that he was not allowed or authorized to visit COVID floors.

239. Interestingly, the dietary employees were even instructed to place the food trucks in the elevators to send to the COVID-19 wards, where the nurses would then pull the trucks out to disburse the food.

240. Hospital police were even instructed to not conduct security checks or patrols on the COVID-19 wards.

241. Nevertheless, PLAINTIFF was the only non-clinical staff member being made to go to each floor, repeatedly, day-after-day.

242. PLAINTIFF discussed the assignments again with Mr. Heaven, who was shocked by PLAINTIFF'S assignments and confirmed, once more, that non-clinical staff were specifically told to not go to the COVID-19 wards.

243. PLAINTIFF also spoke with a nurse, who sternly told PLAINTIFF to not go to the COVID-19 Ward because non-clinical staff are not allowed to go there.

244. PLAINTIFF knew that DEFENDANTS were looking for a reason to discipline PLAINTIFF and PLAINTIFF did not want to get disciplined for insubordination.

245. Nevertheless, PLAINTIFF remained off of the COVID Ward for one day after confirming that she (and everyone else in her similar position) was not supposed to be going to same.

246. Then, on or about May 27, 2020, DEFENDANTS ROSARIO and MCLEISH, called PLAINTIFF into a meeting, and asked PLAINTIFF why she did not go to the COVID-19 ward, the day prior.

247. PLAINTIFF explained as per the policy and directives, as well as instructions from David Weinstein ("Mr. Weinstein"), DEFENDANT HJC'S CEO, PLAINTIFF and other non-clinical staff are not allowed to go to the COVID-19 wards. Indeed, clinical staff were ordered to not visit non COVID designated floors as well. PLAINTIFF'S orders from the CEO and CITY seemed pretty clear.

248. In direct response, DEFENDANT ROSARIO became angry and began yelling at PLAINTIFF that she "*had to go…had to do it!*"

249. Later that night, DEFENDANTS, ROSARIO and MCLEISH, sent PLAINTIFF a disciplinary email stating that PLAINTIFF refused to go to the 7th Floor (COVID-19 Ward).

250. Soon thereafter, PLAINTIFF called her union about the assignments. However, no one responded or returned her calls.

251. PLAINTIFF began visiting the COVID wards as she could not get the union to assist her and did not want to be written up for insubordination.

252. On or about June 8, 2020, PLAINTIFF emailed CEO, Mr. Weinstein, anonymously advised that she was being harassed and if he could discuss same with her.

253. PLAINTIFF did not provide her name and did not go into any details about her complaint because several of her co-workers warned PLAINTIFF that the hospitals phones and computers are closely monitored, and she feared that her harassers could find out about her email.

254.  About two days later, Mr. Weinstein wrote PLAINTIFF back asking if she could provide more information about herself and her complaint.

255.  Unfortunately, after PLAINTIFF revealed who she was and shared that she was being harassed by co-workers in patient relations, PLAINTIFF did not hear from Mr. Weinstein again.

256.  On or about July 7, 2020, PLAINTIFF came to work; proceeded to sign in for the day and obtained her daily COVID patient video call list from DEFENDANT MCLEISH.

257.  On or about July 10, 2020, PLAINTIFF came into work, only to find DEFENDANT MCLEISH and DEFENDANT VIERA waiting for her.

258.  DEFENDANT MCLEISH and DEFENDANT VIERA handed PLAINTIFF a write up for not going to the COVID-19 ward four months earlier, on March 26, 2020.

259.  PLAINTIFF was written up in retaliation for her multiple complaints against DEFENDANT CARTER and in furtherance of the ongoing hostile work environment.

260.  On or about July 26, 2020, PLAINTIFF complained to the new compliance officer, Sofia Khalid ("Ms. Khalid"), about continued bullying, harassment, and intimidation at the hands of NYC DEFENDANTS.

261.  In or around August 2020, PLAINTIFF was counseled for taking approved time off to take PLAINTIFF'S daughter to her appointments, which she was also written up for.

262.  On or about this day, PLAINTIFF also went to a hearing over her writeup for March 26, 2020.

263.  During the meeting, PLAINTIFF and her union representative watched DEFENDANT MCLEISH and DEFENDANT BLITSTEIN, discuss what they wanted to do with PLAINTIFF.

264. PLAINTIFF was then asked what penalty PLAINTIFF was willing to accept. PLAINTIFF responded none because she did nothing wrong.

265. Ultimately, the DEFENDANTS suspended PLAINTIFF for ten days without pay.

266. On or about August 19, 2020, PLAINTIFF emailed Henry Garrido ("Mr. Garrido"), Executive Director of her union, with a subject line "Harassment, Intimidation and Poor Union Representation."

267. PLAINTIFF clearly stated in her email: "***I am sorry that I have to take this to this level, but the level of harassment and intimidation tactics that my department are trying to use against me are becoming mental, physical, and psychologically overbearing…***"

268. Throughout this email, PLAINTIFF detailed continuous retaliatory conduct engaged in by NYC DEFENDANTS, including being forced to go to COVID-19 Quarantine floors.

269. On or about August 20, 2020, Mr. Garrido responded that her matter was "referred to the General Counsel's office" and that someone from his office would reach out to PLAINTIFF.

270. PLAINTIFF complained to the Union that she was being instructed by DEFENDANT MCLEISH to go to the Seventh Floor to assist the nurses in COVID wards.

271. PLAINTIFF continued that she was reprimanded for not going to the COVID floor as instructed and that no other non-clinical staff were being treated in this fashion.

272. Then PLAINTIFF clearly stated, "***I honestly believed this is just plain continued retaliation, bulling, and harassment which I have been facing with Ms. Rosario for more than 2 years… Mr. Mcleish brought this charge in retaliation to previous reports I made to him…***"

273. PLAINTIFF asked for the suspension to be removed from her file because PLAINTIFF

should not have been required to go to the quarantine floor in the first place.

274. On or about September 7, 2020, while PLAINTIFF was assisting visitors, Hospital Police, came up to PLAINTIFF and demanded PLAINTIFF'S chair.

275. On or about September 8, 2020, while PLAINTIFF was again assisting visitors, Hospital Police again demanded PLAINTIFF'S chair and took hold of the chair, despite PLAINTIFF still sitting on same.

276. Soon thereafter, Ms. Hicks came to PLAINTIFF'S location and demanded her chair.

277. As a result, PLAINTIFF began recording the interaction.

278. When PLAINTIFF did not give up the chair, Ms. Hicks ordered Officer Torres and Officer Jucino to remove the chair after PLAINTIFF was done using it for the day.

279. PLAINTIFF went to Human Resources and filed a report of "Intimidating, Disruptive, and Unacceptable Behavior" with Ms. McLean.

280. On or about September 9, 2020, PLAINTIFF came to work to find that her chair was removed.

281. As a result, PLAINTIFF was forced to stand her entire shift, or sit into a corner on one of the visitors' chairs.

282. A few days later, on or about September 11, 2020, PLAINTIFF received an email/writeup from DEFENDANT BLITSTEIN about her "Intimidating, Disruptive, and Unacceptable Behavior" Complaint, stating that it was transferred to him, and he needs to speak with PLAINTIFF.

283. Soon thereafter, the union called PLAINTIFF and told her that DEFENDANT BLITSTEIN recommended PLAINTIFF serve a 60-day suspension without pay.

284. PLAINTIFF vehemently rejected the proposal and requested a Step 2 Hearing.

285. In response, the union proceeded to the Step 2 Grievance.

286. On or about September 21, 2020, PLAINTIFF received a message from DEFENDANT ZEMSKY-CZIZIK, who wanted to see PLAINTIFF.

287. When PLAINTIFF arrived, DEFENDANT ZEMSKY-CZIZIK asked DEFENDANT ROSARIO to come up to join the meeting.

288. Upon hearing this, PLAINTIFF asked if a union representative needed to be present.

289. However, DEFENDANT ZEMSKY-CZIZIK told PLAINTIFF that a union representative was not necessary, and that DEFENDANT ZEMSKY-CZIZIK would (allegedly) pass on the information to the union afterwards.

290. DEFENDANTS, ROSARIO and ZEMSKY-CZIZIK, proceeded to tell PLAINTIFF that her position was (allegedly) being eliminated and that PLAINTIFF would have to be transferred to Bellevue Hospital on or about October 5, 2020, or PLAINTIFF would be terminated.

291. Soon thereafter, PLAINTIFF called the Inspector General's Office and a Compliance Officer about her transfer and to discuss her conversation with DEFENDANTS ZEMSKY-CZIZIK and ROSARIO about same.

292. A few days after PLAINTIFF complained, all of a sudden, DEFENDANT ZEMSKY-CZIZIK called PLAINTIFF and told her that the transfer was no longer going through, and nothing was happening to PLAINTIFF'S job/position.

293. DEFENDANTS were not trying to eliminate the position. DEFENDANTS were instead trying to eliminate PLAINTIFF from the position.

294. On or about September 28, 2020, DEFENDANT MCLEISH gave PLAINTIFF a list to work on two different COVID floors.

295.   Then when the nurses saw PLAINTIFF, they asked PLAINTIFF why PLAINTIFF'S department kept sending PLAINTIFF to the COVID floors.

296.   When PLAINTIFF returned to the Patient Relations Office and PLAINTIFF explained to DEFENDANT MCLEISH what the nurses said, DEFENDANT MCLEISH simply responded "*forget it*."

297.   On or about September 28, 2020, PLAINTIFF complained to NYC DEFENDANTS about the retaliatory work environment and stated, "…*speaking out against the hostile workplace violence I face at this facility. I'm constantly being harassed, bullied, and intimidated by my department and a few members of hospital police department, and though I complain I in turn pay the price*…"

298.   DEFENDANT ZEMSKY-CZIZIK coldly responded: "*Please return the letter acknowledging you are accepting the position.*" DEFENDANT ZEMSKY-CZIZK wanted PLAINTIFF to return the transfer she initially wanted PLAINTIFF to fill out since PLAINTIFF was not going to transfer was no longer going forward.

299.   *DEFENDANT replied further that "[PLAINTIFF] may hand deliver to Danielle Russ in the HR office, or scan and email to me*," and ignored PLAINTIFF'S complaint portion of her acceptance.

300.   On or about September 29, 2020, DEFENDANT MCLEISH again assigned PLAINTIFF to the same two COVID floors.

301.   When PLAINTIFF complained about the assignment, DEFENDANT MCLEISH told PLAINTIFF to *"just put on a gown and go into the patients' rooms."*

302.   PLAINTIFF responded that the nurses said the patients are on "no contact," so PLAINTIFF cannot go into those rooms.

303.   DEFENDANT MCLEISH, upset, replied "***forget it, I will do it.***" However, DEFENDANT MCLEISH did not do the assignment.

304.   PLAINTIFF also complained about being forced to go into the COVID wards without proper protective equipment, including an N-95 mask.

305.   On or about September 30, 2020, DEFENDANT ROSARIO directed PLAINTIFF to go to Occupational Health to get fitted for an N95 mask.

306.   PLAINTIFF reported to the nurse, but after being fit-tested with some difficulties, PLAINTIFF failed the fit test.

307.   Later that night, PLAINTIFF raised concerns to Ms. Williams about the fit testing procedure.

308.   Ms. Williams then told PLAINTIFF if an employee fails the fit test with the N95, then they were supposed to get a face shield.

309.   When PLAINTIFF returned to her desk, DEFENDANT ROSARIO and/or Ms. Vieira told PLAINTIFF to go back to pick up PLAINTIFF'S N95 mask.

310.   PLAINTIFF was confused because she failed the fit test. Nevertheless, Ms. Vieira told PLAINTIFF that PLAINTIFF still had to go pick up a mask.

311.   On or about October 15, 2020, PLAINTIFF received a call from Mr. Williams, DEFENDANT MCLEISH, DEFENDANT ROSARIO, DEFENDANT BLITSTEIN, and others, who told PLAINTIFF that she was scheduled for her Step 2 hearing that day.

312.   During the hearing, the individuals laid out the charges against PLAINTIFF and asked PLAINTIFF why she did not follow instructions.

313.   PLAINTIFF repeated that the Department and interim-CEO both stated that non-clinical staff should not be entering the COVID-19 wards, and that PLAINTIFF was the only

non-clinical staff member being mandated to go to the COVID-19 wards.

314.	DEFENDANTS responded that it did not matter, and that PLAINTIFF was still required to follow their instructions, though contrary to the rules and the CEO's announcement.

315.	PLAINTIFF replied that she was being harassed, bullied, and retaliated against.

316.	However, the individuals disregarded PLAINTIFF'S complaint and told PLAINTIFF that they were not having the meeting to address those issues.

317.	The next day, on or about October 16, 2020, Ms. Lorenzo, DEFENDANT BLITSTEIN, DEFENDANT ROSARIO, and DEFENDANT MCLEISH called PLAINTIFF and told PLAINTIFF that her penalty would be 30 days suspension without pay.

318.	PLAINTIFF immediately rejected the suspension proposal and asked for a Step 3 Hearing.

319.	In or around the third week of October 2020, while PLAINTIFF was waiting for her Step 3 Hearing, PLAINTIFF was called into the Patient Relations Office by DEFENDANTS, ROSARIO and MCLEISH, who provided PLAINTIFF with an envelope.

320.	Once PLAINTIFF opened the document, she saw that she was being suspended for 10 days without pay.

321.	PLAINTIFF immediately told DEFENDANTS, ROSARIO and MCLEISH, that she cannot be suspended because she was waiting on her Step 3 Grievance and that PLAINTIFF needed to speak to her Union.

322.	However, DEFENDANT ROSARIO shouted that PLAINTIFF could not come to work on Sunday since PLAINTIFF'S suspension was effective immediately.

323.	In or around the next day, PLAINTIFF received two separate calls from Hospital Police, who told her that they were instructed that PLAINTIFF was not allowed in the building.

324. PLAINTIFF was unreasonably suspended and her contractual right to a Step 3 about the suspension hearing was intentionally disregarded.

325. In or around December 2020, PLAINTIFF was forced to work on all long-term acute care floors, which housed COVID-19 patients.

326. PLAINTIFF was not an employee providing direct patient care and was not necessary to render aid to COVID-19 patients.

327. No other similarly or non-similarly situated administrative employees were asked, ordered, or directed to work on COVID-19 floors and, in fact, administrative employees were specifically prevented from working on these floors.

328. However, PLAINTIFF was treated differently and her health was put at risk in order to convince or force PLAINTIFF to resign her position and/or to cause PLAINTIFF to become ill with COVID-19, which would force her out of work.

329. As a direct result, as per DEFENDANTS' apparent wishes, on or about December 2, 2020, PLAINTIFF began exhibiting symptoms of COVID-19, and then tested positive for COVID-19.

330. As a direct result of DEFENDANTS' retaliatory actions against PLAINTIFF, PLAINTIFF contracted COVID-19 and was forced out of work.

331. After PLAINTIFF'S diagnosis, no one from PLAINTIFF'S department ever called PLAINTIFF to see how she was doing or to check-in with PLAINTIFF, at all.

332. PLAINTIFF went out on medical leave from on or about December 3, 2020, until on or about November 9, 2021, when PLAINTIFF was summarily terminated.

333. During PLAINTIFF'S medical leave, PLAINTIFF provided regular medical updates from her doctors to NYC DEFENDANTS, as to her ongoing condition and when she

could return to work.

334.   DEFENDANTS did not respond to any of PLAINTIFF'S medical submissions.

335.   PLAINTIFF had "Long Haulers COVID" or "Long COVID," which is a wide range of ongoing health problems people may experience for weeks/months after being infected with COVID-19.

336.   As a result, PLAINTIFF was temporarily disabled and could not immediately return to work following her infection.

337.   Long COVID is a disability under the laws herein, as if affected PLAINTIFF'S ability to perform the functions of her employment.

338.   PLAINTIFF was medically advised that she could/should not get vaccinated for COVID 19 while suffering from Long Haulers COVID.

339.   DEFENDANTS were well aware that PLAINTIFF should not have been required to get the vaccine at that point, due to her ongoing symptoms of COVID 19.

340.   As a result of her disabilities, PLAINTIFF required a reasonable accommodation.

341.   As a result of her disability, DEFENDANTS knew or should have known that they should have engaged in an interactive process or cooperative dialogue with PLAINTIFF to see how they could accommodate her.

**342.   While out on medical leave, NYC DEFENDANTS never contacted nor advised PLAINTIFF about her vaccination requirement or a final date to be vaccinated.**

343.   On or about February 17, 2021, PLAINTIFF informed DEFENDANT MCLEISH that she was not going to be able to make it into work for that day or the next day.

344.   PLAINTIFF was out on medical leave and due to her doctor's ongoing advice, PLAINTIFF was not allowed to return to work and was recommended to stay out on

medical leave due to the effects of COVID 19.

345. PLAINTIFF continued to request extensions to her medical leave due to PLAINTIFF'S COVID-19 symptoms, as per her doctors' orders.

346. On each of these occasions, PLAINTIFF would send the extension requests to DEFENDANT JACQUES.

347. However, each time PLAINTIFF was set to return to work, PLAINTIFF would be told at the last minute that PLAINTIFF needed a clearance letter and a clear diagnosis letter to return to work.

348. On or about March 4, 2021, PLAINTIFF submitted FMLA documents to DEFENDANT JACQUES as it appeared that PLAINTIFF was going to be required to stay out of work for an extended period of time due to Long COVID.

349. On or about March 5, 2021, DEFENDANT JACQUES informed PLAINTIFF if she does not get the full FMLA documentation by on or about March 8, 2021, then PLAINTIFF'S FMLA request would be denied.

350. On or about March 11, 2021, PLAINTIFF lodged a complaint of discrimination and retaliation to Mitchell Katz ("Mr. Katz"), regarding DEFENDANTS, ROSARIO and MCLEISH, excluding PLAINTIFF from meetings, the broken "new" chair incident, a vendetta to force employees to write false statements against PLAINTIFF, as well as DEFENDANT CARTER'S unlawful conduct.

351. A few hours later, Mr. Katz responded: "***…It makes me sad to read your message. Everyone deserves to be treated with dignity and respect. You don't say where you work within H+H. Also, is there some way I can help you? Best wishes…***"

352. PLAINTIFF replied that she works for DEFENDANT HJC and that employees at

DEFENDANT HJC monitor her at work and suspended her without pay.

353.    Since on or about April 1, 2021, NYC DEFENDANTS cut PLAINTIFF from payroll and last left PLAINTIFF without work or income.

354.    On or about March 16, 2021, PLAINTIFF provided Mr. Katz with additional information.

355.    In response, Mr. Katz immediately defended NYC DEFENDANTS conduct by stating: "*I am sorry this has been so difficult. COVID has made everything more difficult, and I think some people are so affected that they are not acting the way they normally would*."

356.    On or about April 7, 2021, PLAINTIFF provided DEFENDANT JACQUES with a medical update from one of PLAINTIFF'S doctors.

357.    The medical note had restrictions thereon and suggested reasonable accommodation would be required for PLAINTIFF to return to work.

358.    On or about April 12, 2021, DEFENDANT JACQUES again advised PLAINTIFF that her doctor's note should state that PLAINTIFF can return to work *without restrictions*.

359.    On or about April 15, 2021, DEFENDANT JACQUES again advised PLAINTIFF that her clearance letter *"must indicate that you are cleared to return to duty without restrictions."*

360.    On or about April 16, 2021, DEFENDANT JACQUES emphasized again that PLAINTIFF needed to be able to return to work "*without restrictions*."

361.    In addition, DEFENDANT JACQUES claimed that PLAINTIFF'S doctor's note required a medical diagnosis and other medical details to be included in the letter.

362.    DEFENDANT JACQUES and his employer, DEFENDANTS HHC/HJC are well aware

that a "no restrictions" return to work disability policy is (*per se*) illegal under the <u>Americans with Disabilities Act</u>, as well as, state and local laws.

363.    DEFENDANTS failed/refused to engage in a cooperative dialogue or interactive process with PLAINTIFF to see if/how she could be accommodated.

364.    On or about April 23, 2021, PLAINTIFF filed an administrative charge with the New York City Commission on Human Rights, regarding the ongoing and continuous retaliation PLAINTIFF faced at the hands of NYC DEFENDANTS.

365.    On or about April 29, 2021, PLAINTIFF was forced to send DEFENDANT JACQUES Short-Term Disability paperwork because PLAINTIFF could not provide a doctor's note that had "no restrictions" thereon.

366.    On both May 3, 2021, and May 4, 2021, PLAINTIFF informed DEFENDANT JACQUES that she was waiting for her doctor to provide her with an updated doctor's note and would be able to submit to her updated Return-to-Work Letter later that day.

367.    On or about May 5, 2021, DEFENDANT JACQUES responded to PLAINTIFF that if a doctor's note was not provided by May 6, 2021, NYC DEFENDANTS would issue an AWOL letter to PLAINTIFF.

368.    Thought DEFENDANT JACQUES knew that PLAINTIFF was not AWOL, and was out for medical reasons, DEFENDANT JACQUES threatened PLAINTIFF'S employment, in retaliation for seeking a reasonable accommodation and due to PLAINTIFF'S complaints about sexual harassment in the past.

369.    On or about May 25, 2021, DEFENDANT JACQUES again advised PLAINTIFF that her doctor's note should state that PLAINTIFF can return to work ***without restrictions***.

370.    On or about June 22, 2021, PLAINTIFF'S doctor, submitted a letter to DEFENDANT

NYC – specifically to Ms. Velez – stating that PLAINTIFF was still suffering from COVID and was unable to work from March 31, 2021, through on or about June 1, 2021.

371.  Dr. Pollack clearly indicated:

> Ms. Findley is currently disabled because of respiratory symptoms and unable to return to work at this time. Her period of disability was originally 3/3/21 through 6/1/21 but should be extended **from 6/1/21 forward**. The exact date for return to work has not been determined since she is still having significant symptoms.

372.  For the third time, on or about June 23, 2021, DEFENDANT JACQUES advised PLAINTIFF that her doctor's note should state that PLAINTIFF can return to work *without restrictions*.

373.  On or about June 25, 2021, despite PLAINTIFF'S doctor's notes and his knowledge that PLAINTIFF remained in communication with DEFENDANTS, DEFENDANT JACQUES informed PLAINTIFF that PLAINTIFF was being marked AWOL as June 7, 2021, and PLAINTIFF'S health benefits were being cut off.

374.  At all times, DEFENDANT JACQUES knew that PLAINTIFF was not AWOL, was suffering from ongoing disabilities, was providing DEFENDANTS with doctor's notes, which specified that PLAINTIFF could not return due to ongoing health issues.

375.  JACQUES also knew that cutting PLAINTIFF off of medical insurance, while PLAINTIFF was being actively treated for medical disabilities and ongoing health issues, would cause additional physical and emotional hardship on PLAINTIFF.

376.  Nevertheless, in continued retaliation and in violation of the statues asserted herein, DEFENDANT JAQUES still reported PLAINTIFF for being AWOL.

377.  When PLAINTIFF asked about her doctor's note that was not responded to, DEFENDANT JACQUES replied that she would get back to PLAINTIFF after she

reviews the medical note with her supervisor.

378. On or about July 7, 2021, a disciplinary hearing was held regarding DEFENDANT'S claim that PLAINTIFF was AWOL.

379. On or about September 2, 2021, PLAINTIFF received a letter from DEFENDANT NYC stating that she was put on inactive payroll status and her last day paid was April 1, 2021.

380. On or about September 28, 2021, PLAINTIFF received a letter from the union regarding her Step 1 Recommendations for being AWOL since on or about June 1, 2021.

381. On or about October 15, 2021, PLAINTIFF received her Step 3 Hearing Confirmation Notice Email and on November 4, 2021, the day of the hearing, received Zoom details of same.

382. Upon information and belief, the Step 3 Hearing was held without PLAINTIFF, who could not attend because she was still out sick with Long COVID.

383. On or about November 9, 2021, PLAINTIFF received a letter from Yvette Villanueva ("Ms. Villanueva"), Senior Vice President of Human Resources, stating that PLAINTIFF'S employment was terminated effective November 9, 2021, for allegedly remaining non-compliant with the COVID-19 vaccination requirement.

384. However, NYC DEFENDANTS were well aware that due to PLAINTIFF suffering from Long COVID, PLAINTIFF was unable to take the COVID-19 vaccine.

385. In addition, despite this awareness, NYC DEFENDANTS failed to engage in an interactive process with PLAINTIFF to find a reasonable accommodation for PLAINTIFF regarding when PLAINTIFF could take the COVID-19 vaccination.

386. However, rather than engage in same, NYC DEFENDANTS wrongfully terminated PLAINTIFF.

387. DEFENDANTS had a blanket policy in place to terminate any employee that did not receive the vaccination despite any disabilities that prevent the employee from same.

388. DEFENDANTS' blanket "vaccination or termination" policies, with no medical exceptions or exemptions, violated the ADA, NYSHRL and NYCHRL.

389. Upon information and belief, on or about November 4, 2021, the City of New York reached an agreement with nine labor unions, including District Council 37 - PLAINTIFF'S union, which provided leave options short of termination to employees who were not yet vaccinated. Upon information and belief, the agreement allowed employees additional time to apply for medical or religious accommodations and provided a date of July 1, 2022, at which time an employee can get vaccinated and return to work.

390. PLAINTIFF was terminated on a date after this agreement was reached.

391. PLAINTIFF was never provided with any information regarding this agreement and not provided with any instruction regarding applying for a medical exemption due to her "Long COVID status." PLAINTIFF was also never advised that she could get the vaccine anytime before July 1, 2022 and be returned to her position.

392. To make matters worse, PLAINTIFF was also wrongfully terminated while she was out on protected FMLA medical leave.

393. NYC DEFENDANTS never engaged in any interactive process with PLAINTIFF before summarily terminating her employment.

394. NYC DEFENDANTS had no good faith business justification for the actions taken against PLAINTIFF herein.

395. PLAINTIFF was ultimately discharged due to her sex/gender, complaints about sexual

harassment by DEFENDANT CARTER, disabilities (whether actual and/or perceived), and/or for seeking reasonable accommodations.

396. At no time did NYC DEFENDANTS intend to offer PLAINTIFF accommodations as is required under Federal, State, and/or City laws.

397. But for PLAINTIFF'S disability and request for accommodations, PLAINTIFF would not have been ultimately discharged.

398. But for PLAINTIFF'S prior complaints about sexual harassment, PLAINTIFF would not have been ultimately discharged.

399. DEFENDANTS' wrongful disciplinary actions and termination of PLAINTIFF was motivated (in whole and in part) on PLAINTIFF'S engagement in protected activities and her disabilities.

400. NYC DEFENDANTS' actions were malicious, intentional, and intended to harm PLAINTIFF.

**401. NYC DEFENDANTS' conduct was a <u>continuing violation of</u> PLAINTIFF'S rights.**

402. As a result of NYC DEFENDANTS' actions, PLAINTIFF was humiliated, degraded, victimized, embarrassed and emotionally distressed.

403. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

404. NYC DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted

with full knowledge of the law. As such, punitive damages as against NYC DEFENDANTS are appropriate.

**AS A FIRST CAUSE OF ACTION**
**FOR *DISCRIMINATION* UNDER TITLE VII**
*(Against DEFENDANT NYC/HHC/HJA)*

405.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

406.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq*., for relief based upon the unlawful employment practices of DEFENDANT NYC.

407.   DEFENDANT NYC engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e *et seq*., by discriminating against PLAINTIFF because of her sex/gender and complaints about sexual harassment by DEFENDANT CARTER.

408.   PLAINTIFF was subjected to discrimination and retaliation at DEFENDANT NYC as alleged above.

409.   PLAINTIFF was subjected to a discriminatory and retaliatory hostile work environment and/or a workplace that was permeated with sex/gender bias, sex/gender motivated adverse employment actions, retaliation, unfair assignment refusals, differential treatment, adverse employment actions, differential treatment, unfair performance reviews, selective supervision, selective enforcement of rules, harassment, abuse, wrongful termination, and other discriminatory acts.

410.   PLAINTIFF complained about the discriminatory abuse she faced at the hands of her supervisors and coworkers and said complaint(s) were futile and ignored.

411.   Instead, PLAINTIFF was further subjected to a retaliatory hostile working environment,

termination, adverse employment action, and other unreasonable acts due to her sex/gender and complaints about sexual harassment.

412. PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws, as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT NYC.

413. NYC DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

414. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT NYC.

415. At all times, DEFENDANT NYC was aware and/or had actual and constructive notice of its sex/gender hostile work environment against PLAINTIFF and took no action to abate or correct same.

416. Instead, NYC DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in a protected activity while allowing the perpetrators to escape discipline.

417. DEFENDANT NYC'S purported anti-discrimination and anti-retaliation policies (if any) were futile and not adhered to by NYC DEFENDANTS in any regard - to the detriment of PLAINTIFF.

418. But for INDIVIDUAL DEFENDANTS' positions at DEFENDANT NYC, NYC DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

419. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

420. DEFENDANT NYC is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

421.  As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, adverse employment actions, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

422.  NYC DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

423.  PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A SECOND CAUSE OF ACTION
### FOR *RETALIATION* UNDER TITLE VII
### *(Against DEFENDANT NYC/HHC/HJC)*

424.  PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

425.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

426.  DEFENDANT NYC engaged in unlawful employment practice prohibited by 42 U.S.C. §§ 2000e *et seq.*, by discriminating against PLAINTIFF with respect to the terms, conditions, or privileges of employment because of her opposition to the unlawful employment practices at DEFENDANT NYC.

427.  PLAINTIFF complained (on multiple occasions) about the discriminatory abuse she

faced at the hands of her supervisors, coworkers, including INDIVIDUAL DEFENDANTS, and said complaints were ignored.

428. Instead, PLAINTIFF was further subjected to adverse employment actions, increased scrutiny, unreasonable workloads, differential treatment, verbal abuse, threats against her employment, humiliation, adverse employment actions, and wrongful termination.

429. PLAINTIFF was wrongfully terminated in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT NYC.

430. NYC DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

431. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT NYC.

432. At all times, DEFENDANT NYC was aware and/or had actual and constructive notice of its sex/gender hostile work environment and took no action to abate or correct same.

433. Instead, NYC DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in a protected activity while allowing the perpetrators to escape discipline.

434. DEFENDANT NYC'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

435. But for INDIVIDUAL DEFENDANTS' positions at DEFENDANT NYC, NYC DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

436. NYC DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following her engagement in protected activity.

437. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

438. DEFENDANT NYC is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

439. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, adverse employment actions, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

440. NYC DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

441. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
### (*Municipal Liability and Individual Liability Against NYC DEFENDANTS*)

442. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

443. At all times, NYC DEFENDANTS, HENRY J. CARTER, FLOYD LONG, JEANETTE ROSARIO, NYRON MCLEISH, DEBBIE JACQUES, JEAN-JACQUES BLITSTEIN and KAREN ZEMSKY-CZIZIK, were each acting under color of law and pursuant to their duties and obligations as employees of Public Authority DEFENDANT NYC/HJC.

444. At all times, INDIVIDUAL DEFENDANTS were policymakers for DEFENDANT NYC/HJC and were directly involved in the actions and/or violations of PLAINTIFF'S

rights as alleged herein.

445.   PLAINTIFF was discriminated against, denied equal protection, subjected to hostile work environment, abused and caused to suffer physical and emotional harm due, in part, to the actions of DEFENDANT NYC'S Employees, INDIVIDUAL DEFENDANTS, HENRY J. CARTER, FLOYD LONG, JEANETTE ROSARIO, NYRON MCLEISH, DEBBIE JACQUES, JEAN-JACQUES BLITSTEIN and KAREN ZEMSKY-CZIZIK

446.   DEFENDANTS also had a blanket custom or policy in denying reasonable accommodation to employees that could not be vaccinated due to medical conditions.

447.   DEFENDANTS never assessed whether PLAINTIFF would be able to be vaccinated after November 2021 before wrongfully terminating her employment.

448.   DEFENDANTS also had a policy wherein its employees (such as PLAINTIFF) could not return to duty unless her doctors cleared her to return without restrictions.

449.   Insofar as DEFENDANT NYC/HJC did not have a blanket policy, then INDIVIDUAL DEFENDANTS violated PLAINTIFF'S rights pursuant to their own individual malicious motives against PLAINTIFF, while all acting under color of law.

450.   PLAINTIFF was qualified for her position with the DEFENDANT NYC/HJC.

451.   PLAINTIFF informed NYC DEFENDANTS of her complaints of sexual harassment and her need for a reasonable accommodation.

452.   PLAINTIFF had a property right to her employment with DEFENDANT NYC as a union employee, as well as a substantive due process right to a work environment free from discrimination based on her complaints of sexual harassment and her need for a reasonable accommodation.

453.   PLAINTIFF was subjected to adverse employment actions by NYC DEFENDANTS,

who were each acting under color of law at all times relevant to the Complaint.

454.   PLAINTIFF was deprived of her right to employment as well as right to be free from discrimination and retaliation.

455.   PLAINTIFF was forced to make a choice between her employment with DEFENDANT NYC and her bodily integrity.

456.   PLAINTIFF was subjected to direct discriminatory statements, ridicule, insults, threats, battery and other abusive conduct due to her complaints of sexual harassment and request(s) for disability accommodations.

457.   With direct knowledge of the continued abusive conduct against PLAINTIFF following her complaints of sexual harassment and request(s) for disability accommodations, INDIVIDUAL DEFENDANTS continued, condoned, ratified, supported, aided, abetted and directly participated in the acts alleged herein.

458.   NYC DEFENDANTS violated PLAINTIFF'S right to substantive and procedural due process.

459.   Because of NYC DEFENDANTS' (individual and collective) actions, PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

460.   As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, loss of employment, loss of a salary/pay, benefits, special damages and other compensation, which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

461.   NYC DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

462.    PLAINTIFF is entitled to the maximum amount allowable under this law.

## AS A FOURTH CAUSE OF ACTION FOR *DISCRIMINATION* UNDER THE AMERICANS WITH DISABILITIES ACT (*Against DEFENDANT NYC*)

463.    PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

464.    Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

465.    But for PLAINTIFF'S disabilities and request for reasonable accommodations, DEFENDANT NYC would not have terminated PLAINTIFF'S employment.

466.    In the alternative, DEFENDANTS' conduct were motivated by discriminatory animus against PLAINTIFF.

467.    PLAINTIFF advised DEFENDANTS that she had a disability and requested reasonable accommodations on multiple occasions.

468.    DEFENDANT NYC refused to accommodate PLAINTIFF and declined to engage in the interactive process.

469.    Most certainly, INDIVIDUAL DEFENDANTS, PLAINTIFF'S Supervisors/Managers, were aware of NYC DEFENDANTS' obligations to engage in an interactive process and to access whether they could accommodate PLAINTIFF.

470.    INDIVIDUAL DEFENDANTS knew or should have known of their obligations to accommodate PLAINTIFF under the ADA.

471. DEFENDANTS outright denied reasonable accommodations to employees (such as PLAINTIFF) that could not be vaccinated due to medical conditions.

472. DEFENDANTS never assessed whether PLAINTIFF would be able to be vaccinated after November 2021 before wrongfully terminating her employment.

473. DEFENDANTS also refused to allow PLAINTIFF to return to duty unless her doctors cleared her to return without restrictions.

474. As PLAINTIFF had no performance issues prior to PLAINTIFF'S complaints of sexual harassment and her requests for reasonable accommodation, DEFENDANT NYC had no good-faith business justification to terminate PLAINTIFF.

475. NYC DEFENDANTS engaged in an unlawful discriminatory practice by terminating PLAINTIFF because of his disabilities.

476. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

477. As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

### AS A FIFTH CAUSE OF ACTION FOR *RETALIATION* UNDER THE AMERICANS WITH DISABILITIES ACT (*Against DEFENDANT NYC*)

478. PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

479. The ADA prohibits retaliation, interference, coercion, or intimidation.

480. 42 U.S.C. § 12203 provides:

    i.    Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

    ii.    Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

481. DEFENDANT NYC engaged in an unlawful discriminatory practice by retaliating against PLAINTIFF because of his disability and for engaging in protected activity by requesting a reasonable accommodation.

482. Most certainly, INDIVIDUAL DEFENDANTS were aware of NYC DEFENDANTS' obligations to engage in an interactive process and to access whether they could accommodate PLAINTIFF.

483. INDIVIDUAL DEFENDANTS knew or should have known of their obligations to accommodate PLAINTIFF under the ADA.

484. NYC DEFENDANTS refused to attempt to assist and/or accommodate PLAINTIFF in accord with their obligations as managers and supervisors.

485. As PLAINTIFF had no performance issues prior to PLAINTIFF'S complaints of sexual harassment and her requests for reasonable accommodation, DEFENDANT NYC had no good-faith business justification to terminate PLAINTIFF.

486. But for PLAINTIFF'S disabilities, DEFENDANT NYC would not have terminated PLAINTIFF.

487.    But    for    PLAINTIFF'S    multiple    requests    for    reasonable    accommodations, DEFENDANTS would not have terminated PLAINTIFF.

488.    As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

489.    As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

### AS A SIXTH CAUSE OF ACTION FOR *DISCRIMINATION* UNDER THE NEW YORK STATE EXECUTIVE LAW

490.    PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

491.    The New York State Executive Law § 296(1)(a) provides in pertinent part: "It shall be an unlawful discriminatory practice: For an employer . . . because of an individual's . . . sex, disability . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

492.    NYC DEFENDANTS violated this section as set forth herein.

493.    At all times, PLAINTIFF suffered from a disability (Long COVID).

494.    But for PLAINTIFF'S disability and requests for reasonable accommodations, NYC DEFENDANTS would not have terminated PLAINTIFF'S employment.

495.    PLAINTIFF advised NYC DEFENDANTS that she had a disability and requested reasonable accommodations on multiple occasions.

496.    NYC DEFENDANTS refused to accommodate PLAINTIFF and declined to engage in

the interactive process.

497.   Most certainly, INDIVIDUAL DEFENDANTS were aware of NYC DEFENDANTS'
obligations to engage in an interactive process and to access whether they could
accommodate PLAINTIFF.

498.   INDIVIDUAL DEFENDANTS knew or should have known of their obligations to
accommodate PLAINTIFF under the law.

499.   NYC DEFENDANTS refused to attempt to assist and/or accommodate PLAINTIFF in
accord with their obligations as managers and supervisors.

500.   DEFENDANTS also had a blanket custom or policy in denying reasonable
accommodation to employees that could not be vaccinated due to medical conditions.

501.   DEFENDANTS never assessed whether PLAINTIFF would be able to be vaccinated
after November 2021 before wrongfully terminating her employment.

502.   DEFENDANTS also had a policy wherein its employees (such as PLAINTIFF) could not
return to duty unless her doctors cleared her to return without restrictions.

503.   INDIVIDUAL DEFENDANTS are liable for aiding and abetting the
discriminatory/retaliatory conduct of their Principal, DEFENDANT NYC.

504.   NYC DEFENDANTS engaged in an unlawful discriminatory practice by terminating
PLAINTIFF because of her complaints of sexual harassment, disabilities. and requests
for reasonable accommodations.

505.   As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of
income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other
compensation which such employment entails, and PLAINTIFF has also suffered future
pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of

enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

506.  As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

**AS FOR A SEVENTH CAUSE OF ACTION FOR *RETALIATION*
UNDER THE NEW YORK STATE EXECUTIVE LAW**

507.  PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

508.  New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because she has opposed any practices forbidden under this article."

509.  NYC DEFENDANTS violated this section as set forth herein.

510.  NYC DEFENDANTS engaged in an unlawful discriminatory practice by retaliating against PLAINTIFF because of her complaints of sexual harassment, her disabilities, and for engaging in protected activity by requesting a reasonable accommodation.

511.  Most certainly, INDIVIDUAL DEFENDANTS were aware of NYC DEFENDANTS' obligations to engage in an interactive process and to access whether they could accommodate PLAINTIFF.

512.  INDIVIDUAL DEFENDANTS knew or should have known of their obligations to accommodate PLAINTIFF under the law.

513.  NYC DEFENDANTS refused to attempt to assist and/or accommodate PLAINTIFF in accord with their obligations as managers and supervisors.

514.  But for PLAINTIFF'S complaints of sexual harassment, her disabilities, and requests for reasonable accommodations, NYC DEFENDANTS would not have terminated her.

515.    INDIVIDUAL DEFENDANTS are liable for aiding and abetting the discriminatory/retaliatory conduct of their Principal, DEFENDANT NYC.

516.    But for PLAINTIFF'S multiple requests for reasonable accommodations, NYC DEFENDANTS would not have terminated her.

517.    As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

518.    As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

**AS AN EIGHTH CAUSE OF ACTION FOR *DISCRIMINATION/RETALIATION UNDER THE NEW YORK STATE EXECUTIVE LAW***
**(*Individual Liability against INDIVIDUAL DEFENDANTS  HENRY J. CARTER, FLOYD LONG, JEANETTE ROSARIO, NYRON MCLEISH, DEBBIE JACQUES, JEAN-JACQUES BLITSTEIN and KAREN ZEMSKY-CZIZIK*)**

519.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint.

520.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to **aid, abet,** incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

521.    INDIVIDUAL DEFENDANTS violated the section cited herein as set forth and were each personally involved in the discriminatory and retaliatory actions about which PLAINTIFF complains herein.

522.    INDIVIDUAL DEFENDANTS utilized their powers, authorities, statuses, and positions

to subject PLAINTIFF to the wrongful treatment outlined in this Complaint.

523. But for INDIVIDUAL DEFENDANTS' positions with/at DEFENDANT NYC, INDIVIDUAL DEFENDANTS would not have been able or authorized to take and continue their discriminatory and retaliatory campaign against PLAINTIFF.

524. At all times relevant to the Complaint, while employed at DEFENDANT NYC, PLAINTIFF was continuously subjected to discriminatory comments/intimidation, differential treatment, wrongful termination, and other discriminatory/retaliatory actions as alleged above.

525. INDIVIDUAL DEFENDANTS acting pursuant to their authority, ignored DEFENDANT NYC own policies, procedures, and rules regarding discriminatory behavior in the workplace generally.

526. At all times, INDIVIDUAL DEFENDANTS were aware of their obligations to stop, prevent, investigate, and correct discriminatory practices against PLAINTIFF.

527. INDIVIDUAL DEFENDANTS are individually liable for aiding and abetting the discriminatory actions of their employer, DEFENDANT NYC.

528. INDIVIDUAL DEFENDANTS had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

529. As a result of NYC DEFENDANTS' discriminatory treatment of PLAINTIFF, she has suffered severe emotional distress.

530. PLAINTIFF was unlawfully humiliated, degraded, and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, humiliation, stress, anxiety, embarrassment, special damages, and emotional

distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, physical injuries, physical conditions, and other non-pecuniary losses.

531.   NYC DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

532.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A NINTH CAUSE OF ACTION FOR *DISCRIMINATION* <u>UNDER THE NEW YORK CITY ADMINISTRATIVE CODE</u>

533.   PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

534.   The <u>Administrative Code of the City of New York</u> § 8-107(1) provides that

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, **gender**, **disability**, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

535.   NYC DEFENDANTS violated the section cited herein.

536.   But for PLAINTIFF'S disability and request for reasonable accommodations, NYC DEFENDANTS would not have terminated PLAINTIFF'S employment.

537.   PLAINTIFF advised NYC DEFENDANTS that she had a disability and requested reasonable accommodations on multiple occasions.

538.   PLAINTIFF also complained of sexual harassment and a hostile work environment due to her gender.

539.   NYC DEFENDANTS refused to accommodate PLAINTIFF and declined to engage in the interactive process.

540. Most certainly, INDIVIDUAL DEFENDANTS were aware of NYC DEFENDANTS' obligations to engage in an interactive process and to access whether they could accommodate PLAINTIFF.

541. INDIVIDUAL DEFENDANTS knew or should have known of their obligations to accommodate PLAINTIFF under the law.

542. NYC DEFENDANTS refused to attempt to assist and/or accommodate PLAINTIFF in accord with their obligations as managers and supervisors.

543. DEFENDANT NYC is vicariously liable for the actions alleged herein as all INDIVIDUAL DEFENDANTS were acting within the scope of their authorities as an officer, agent, manager, supervisor, or representative of their Principal, DEFENDANT NYC.

544. DEFENDANTS also protected the individual that subjected PLAINTIFF to sexual harassment while retaliating against PLAINTIFF.

545. NYC DEFENDANTS engaged in an unlawful discriminatory practice by terminating PLAINTIFF because of her disabilities.

546. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

547. As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

**AS A TENTH CAUSE OF ACTION FOR *RETALIATION*
UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

548.    PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

549.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

550.    NYC DEFENDANTS engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against PLAINTIFF because of PLAINTIFF'S opposition to the unlawful employment practices of PLAINTIFF'S employer.

551.    NYC DEFENDANTS engaged in an unlawful discriminatory practice by retaliating against PLAINTIFF because of her disabilities and for engaging in protected activity by requesting a reasonable accommodation, as well as PLAINTIFF'S complaints of sexual harassment.

552.    Most certainly, INDIVIDUAL DEFENDANTS were aware of NYC DEFENDANTS' obligations to engage in an interactive process and to access whether they could accommodate PLAINTIFF.

553.    INDIVIDUAL DEFENDANTS knew or should have known of their obligations to accommodate PLAINTIFF under the law.

554.    NYC DEFENDANTS refused to attempt to assist and/or accommodate PLAINTIFF in accord with their obligations as managers and supervisors.

555.    As PLAINTIFF had no performance issues prior to PLAINTIFF'S complaints of sexual harassment and her requests for reasonable accommodation, NYC DEFENDANTS had

no good-faith business justification to terminate PLAINTIFF.

556. But for PLAINTIFF'S disabilities and complaints of sexual harassment, NYC DEFENDANTS would not have terminated her.

557. But for PLAINTIFF'S multiple requests for reasonable accommodations, NYC DEFENDANTS would not have terminated her.

558. DEFENDANTS also protected the individual that subjected PLAINTIFF to sexual harassment while retaliating against PLAINTIFF.

559. DEFENDANT NYC is vicariously liable for the actions alleged herein as INDIVIDUAL DEFENDANTS were acting within the scope of their authority as an officer, agent, manager, supervisor, or representative of their Principal, DEFENDANT NYC.

560. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

561. As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

**AS AN ELEVENTH CAUSE OF ACTION FOR *DISCRIMINATION/RETALIATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
*(Aider and Abettor Liability against INDIVIDUAL DEFENDANTS* **HENRY J. CARTER, FLOYD LONG, JEANETTE ROSARIO, NYRON MCLEISH, DEBBIE JACQUES, JEAN-JACQUES BLITSTEIN and KAREN ZEMSKY-CZIZIK)**

562. PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

563. The New York City Administrative Code § 8-107(6) provides that it shall be unlawful

discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

564.  NYC DEFENDANTS engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory conduct.

565.  But for PLAINTIFF'S disabilities and request for reasonable accommodations, NYC DEFENDANTS would not have terminated PLAINTIFF'S employment.

566.  PLAINTIFF advised NYC DEFENDANTS that she was being sexually harassed, then later that she had a disability, and requested reasonable accommodations on multiple occasions.

567.  NYC DEFENDANTS refused to accommodate PLAINTIFF and declined to engage in the interactive process.

568.  NYC DEFENDANTS engaged in an unlawful discriminatory practice by retaliating against PLAINTIFF because of her complaints of sexual harassment, her disabilities, and for engaging in protected activity by requesting a reasonable accommodation.

569.  Most certainly, INDIVIDUAL DEFENDANTS were aware of NYC DEFENDANTS' obligations to engage in an interactive process and to access whether they could accommodate PLAINTIFF.

570.  INDIVIDUAL DEFENDANTS knew or should have known of their obligations to accommodate PLAINTIFF under the law.

571.  INDIVIDUAL DEFENDANTS aided and abetted DEFENDANT NYC in its discrimination against PLAINTIFF.

572.  But for INDIVIDUAL DEFENDANTS' positions as managers and/or supervisors at

DEFENDANT NYC, she would not have been able to discriminate and retaliated against PLAINTIFF.

573. NYC DEFENDANTS refused to attempt to assist and/or accommodate PLAINTIFF in accord with their obligations as managers and supervisors.

574. As PLAINTIFF had no performance issues prior to PLAINTIFF'S complaints of sexual harassment and her requests for reasonable accommodation, NYC DEFENDANTS had no good-faith business justification to terminate PLAINTIFF.

575. But for PLAINTIFF'S disabilities, NYC DEFENDANTS would not have terminated her.

576. But for PLAINTIFF'S multiple requests for reasonable accommodations, NYC DEFENDANTS would not have terminated her.

577. DEFENDANT NYC is vicariously liable for the actions alleged herein as INDIVIDUAL DEFENDANTS were acting within the scope of his authorities as an officer, agent, manager, supervisor, or representative of his Principal, DEFENDANT NYC.

578. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered a loss of income, the loss of a salary, loss of bonuses, loss of benefits, loss of employment, and other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, special damages, emotional pain, suffering, inconvenience, loss of enjoyment of life and other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

579. As such, PLAINTIFF is entitled to the maximum amount allowed under this law.

## JURY DEMAND

580.    PLAINTIFF requests a jury trial.

**WHEREFORE**, PLAINTIFF respectfully requests a judgment against the NYC DEFENDANTS:

A.      Declaring that NYC DEFENDANTS engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Family Medical Leave Act, the Labor Relations Management Act, the New York State Human Rights Law, and the New York City Administrative Code, and in that NYC DEFENDANTS discriminated against PLAINTIFF on the basis of her sex/gender, complaints of sexual harassment, disabilities (whether actual and/or perceived) and/or need for a reasonable accommodation;

B.      Awarding damages to PLAINTIFF for all lost wages and benefits resulting from NYC DEFENDANTS' unlawful discrimination and retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding PLAINTIFF compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to his reputation in an amount to be proven;

D.      Awarding PLAINTIFF punitive damages;

E.      Awarding PLAINTIFF attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F.      Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just, and proper to remedy the NYC DEFENDANTS' unlawful employment practices.

Dated:  New York, New York
        February 3, 2023

                                    **PHILLIPS & ASSOCIATES,**
                                    **ATTORNEYS AT LAW, PLLC**


By:     _____
                                    Gregory Calliste, Jr., Esq.
                                    Alexandria Jean-Pierre, Esq.
                                    *Attorneys for Plaintiff*
                                    45 Broadway, Suite 430
                                    New York, New York 10006
                                    T: (212) 248-7431
                                    F: (212) 901 - 2107
                                    gcalliste@tpglaws.com
                                    ajean-pierre@tpglaws.com

EXHIBIT A

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

November 30, 2022

Ms. Loraine Findley
c/o Gregory Calliste, Jr., Esquire
Law Offices of Phillips & Assocs.
45 Broadway, Suite 430
New York, NY  10006

Re:  EEOC Charge Against New York City Health & Hospitals, et al.
    No. 520202104667

Dear Ms. Findley:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                                   Sincerely,

                                   Kristen Clarke
                                   Assistant Attorney General
                                   Civil Rights Division

                              by       /s/ Karen L. Ferguson
                                   Karen L. Ferguson
                                   Supervisory Civil Rights Analyst
                                   Employment Litigation Section

cc: New York District Office, EEOC
   New York City Health & Hospitals, et al.