UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LORAINE FINDLEY,

                        Plaintiff,

      -against-                                No. 23-CV-00946-LTS-RFT

HENRY J. CARTER, in his individual and
official capacities,

                        Defendant.

-------------------------------------------------------x

## MEMORANDUM ORDER

Plaintiff Loraine Findley ("Findley") commenced this action on February 3, 2023, asserting discrimination claims under federal, state, and local law against the City of New York (the "City"), the New York City Health and Hospital Corporation ("HHC"), Henry J. Carter Specialty Hospital and Nursing Home ("HJC"), and a number of individual defendants in their individual and official capacities. (Docket entry no. 1 (the "Complaint").) This action has been resolved as against all of the defendants, with the exception of claims asserted against defendant Henry J. Carter ("Carter"). (See docket entry no. 65.) The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

Pending before the Court is Carter's motion for summary judgment, seeking dismissal of the Complaint in full. (Docket entry no. 103.) The Court has reviewed the parties' submissions thoroughly and, for the following reasons, Carter's motion is granted.

## BACKGROUND

The following facts are drawn from the record and the parties' filings in connection with the pending motion, and are undisputed except where noted.

Plaintiff's Complaint stems from her former employment with HJC, which she asserts commenced in March of 2015. (Docket entry no. 113 ("Pl. 56.1") ¶ 1.) Plaintiff alleges that, during her employment with HJC, she was assigned to the front desk of the facility and in the office, and that Carter sexually harassed her in the HJC lobby area where she was assigned to sit. (Id. ¶¶ 2, 22-25.) She alleges that the harassment continued from 2016 through 2019. (Id. ¶¶ 22-25.)

Carter is the Chairman of Wheelchair Charities, a nonprofit corporation that provides motorized wheelchairs to paraplegics and quadriplegics in New York City-area hospitals. (Docket entry no. 126 ("Def. 56.1") ¶¶ 1, 7.) Carter has also donated significant sums to City hospitals. (Id. ¶ 5; docket entry no. 127 ("Pl. 56.1 Resp.") ¶ 5.) As a result of Carter's charitable pursuits, HHC named the HJC facility after him. (Def. 56.1 ¶ 8.)

Plaintiff asserts that she believed that Carter was an employee of HJC "because of the influence that she observed him exert within the hospital and the things that he had told her." (Pl. 56.1 ¶ 9.) Specifically, Plaintiff alleges that Carter: (1) has an office within the hospital, (2) was present at the hospital every day from 2016 to 2019, (3) attended meetings with HJC staff, including the Chief Executive Officer, Floyd Long, (4) "invite[d] visitors who had issues in the facility to bring issues to [Carter] and he would 'see what he could do'"; (5) stated to visitors that he is the owner of the facility; (6) "was responsible for getting other individuals their positions," and told Plaintiff as much, (7) was driven around in an HHC vehicle; and (8) has donated approximately $35 million to HHC. (Pl. 56.1 ¶¶ 11-17, 20-21, 30.) Plaintiff supports these allegations with citations to a July 2024 deposition of Carter. (See id.)

Carter disputes or purports to provide clarification as to the framing of these facts, also pointing to his deposition transcript to establish that he (1) was not present every day at the

hospital from 2016 to 2019, but rather was there visit his friend, who was injured, "mostly every day" from 2016 until he passed away in 2018, (2) had meetings with some of the HJC staff to see what needs could be addressed through his charitable efforts, which meetings only occurred once or twice a year, (3) only sought to address patient issues that had to do with the need for motorized wheelchairs, which he had capacity to address through his charity organization, (4) did not explicitly state that he owned the hospital, but rather that the hospital was named after him, (5) might have suggested or supported candidates for employment at HJC and might have said he had something to do with hiring; and (6) was only driven in an HHC vehicle when visiting patients' homes to determine eligibility for motorized wheelchairs.  (Docket entry no. 124 ("Def. 56.1 Resp.") ¶¶ 11, 13, 16-21.)

        Following the stipulated dismissal of this action as against the City, HHC, and the individual defendants other than Carter, all of whom were represented by the New York City Law Department, Carter initiated the instant motion practice.  (Docket entry nos. 71-72, 103.)  Carter's principal argument is that, because he is not an employee or policymaker for the City and his actions cannot be attributed to the state, Plaintiff's claim under 42 U.S.C. section 1983 ("Section 1983") is improperly asserted against him, and the Court lacks subject matter jurisdiction as a result.  (See docket entry no. 103 ("Def. Mem.") at 7-10.)

## DISCUSSION

        Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In determining whether there is a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted).

Section 1983 provides relief for a plaintiff deprived of any "rights, privileges, or immunities secured by the Constitution and its laws." 42 U.S.C.A. § 1983 (Westlaw through P.L. 119-4).  The statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979); see also Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999).  To state a claim under Section 1983, a plaintiff must plead two essential elements: (1) the conduct complained of was attributable to a person or entity acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right. Charles W. v. Maul, 214 F.3d 350, 357 (2d Cir. 2000).  For purposes of Section 1983, the actions of a nominally private person or entity have been found to be attributable to the state in three circumstances:

> (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state ('the public function test').

Fabrikant v. French, 691 F.3d 193, 207 (2d Cir. 2012) (citation omitted).  Absent such a showing, the under-color-of-state-law element of Section 1983 excludes from its reach "merely private conduct, no matter how discriminatory or wrongful." Am. Mfrs. Mut. Ins. Co. v.

Sullivan, 526 U.S. 40, 50 (1999) (internal quotation marks and citation omitted). Although a "necessarily fact-bound inquiry," "the ultimate resolution of whether a defendant acted under color of state law is a question of law for the court." Miron v. Town of Stratford, 976 F. Supp. 2d 120, 136 (D. Conn. 2013) (gathering cases).

As relevant here, the "joint action" or "close nexus" test looks to whether "the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" Sullivan, 526 U.S. at 52 (citations omitted). Under this line of case law, the "mere approval or acquiescence of the State" as to some action taken by a private entity or individual is not state action. Id. (citations omitted). Moreover, it is insufficient "to plead state involvement in some activity of the [person or entity] alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257-58 (2d Cir. 2008) (emphasis in original) (citations and internal quotation marks omitted).

One mechanism by which a plaintiff may demonstrate the requisite "joint action" or "close nexus" for state action is the so-called "symbiotic relationship" test established in Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961), which looks to whether the state has "so far insinuated itself into a position of interdependence with [the acting private party] that it must be recognized as a joint participant in the challenged activity." Id. at 725. In analyzing challenged conduct under this framework, courts "often examine whether the government has control over the private actor's 'day-to-day' operations and whether the government shares in any profits the private entity has generated from the challenged conduct." Forbes v. City of New York, No. 05-CV-7331-NRB, 2008 WL 3539936, at *7 (S.D.N.Y. Aug. 12, 2008) (emphasis in

original) (citations omitted) (noting that "the weight of authority suggests that Burton . . . is highly circumscribed authority"). Importantly, "'symbiosis' applies only where the alleged relationship has clear nexus with the conduct alleged to be unconstitutional." Id.; see also Murphy v. N.Y. Racing Ass'n, Inc., 76 F. Supp. 2d 489, 495-96 (S.D.N.Y. 1999) ("[T]he most important aspect of Burton's holding, according to subsequent Supreme Court opinions, is its holding that 'profits earned by discrimination not only contributed to, but also [were] indispensable elements in, the financial success of a governmental agency.'" (citations omitted)).

      Carter seeks dismissal of Plaintiff's claims on the basis that he is not a state actor, and thus a Section 1983 claim may not be properly asserted against him.[1] Plaintiff does not specifically dispute Carter's claim that he was not formally employed by HJC or any other City entity; rather, Plaintiff argues at length that, "when evaluating the evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that there existed a sufficiently close nexus between the hospital and Defendant Carter and that the action of the Defendant Carter may be fairly treated as that of the hospital." (Pl. Mem. at 5-6 (identifying the facts, which framing Carter largely disputes, see discussion supra pp. 2-3, as sufficient to establish a symbiotic relationship between Carter and HJC that supports a finding of state action).) As noted, however, the question of state action is a legal question to be resolved by the Court, not a factual question to be resolved by the jury. Whether Carter is entitled to summary judgment therefore turns on whether this Court finds, as a matter of law, that the requisite nexus between Carter and

---

[1] Although Carter characterizes this purported deficiency as a lack of subject matter jurisdiction (Def. Mem. at 7-9), his arguments instead go to the merits of Plaintiff's Section 1983 claim, as state action is an element of a Section 1983 claim. Maul, 214 F.3d at 357.

HJC existed such that Carter was acting under color of state law when he allegedly committed the conduct of which Plaintiff complains, i.e., sexual harassment.

The Court finds that Plaintiff has failed to demonstrate the requisite nexus. Plaintiff does not assert that HJC exercised any control over Carter, delegated any kind of authority to him, or encouraged him to hold himself out as any kind of representative, employee, or owner of HJC,[2] beyond Plaintiff's assertion that she personally believed that Carter was a City employee—a speculative assertion that is unavailing for purposes of summary judgment. See, e.g., Woodman v. WWOR-TV, Inc., 411 F.3d 69, 85 (2d Cir. 2005) ("The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment." (internal quotation marks and citations omitted)).  Most of the conduct Plaintiff identifies as tying Carter to HJC involved his charitable pursuits at HJC and other local hospitals. See discussion supra pp. 2-3.  While Carter may have garnered informal influence by virtue of his private charity work and sizable donations, the record before the Court does not evidence the kind of extensive state and private entanglements that courts have previously characterized as "symbiotic relationships" that may support a finding of state action.  Indeed, Plaintiff demonstrates no entanglement whatsoever between HJC and Carter in connection with the alleged sexual harassment.

In the seminal Burton case, for example, the private entity, a restaurant, operated in a space leased directly from a Wilmington municipal parking authority, with the authority covenanting in the lease agreement to decorate and provide utilities for such space. Burton, 365 U.S. at 719, 722-24.  The Court reasoned that it could not be ignored that the authority stood to

---

[2]   Plaintiff does note that HJC provided an office to Carter, but it is unclear from the record the purpose for which this office was conveyed and how, if at all, HJC identified Carter in connection with the office space.

benefit from the challenged conduct—racial discrimination in the admittance of patrons—particularly in light of the restaurant's affirmative allegation that equal access would injure its business.  Id. at 724.  In view of these facts and the other "activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service," the Court found an actionable "degree of state participation and involvement in discriminatory action" to be present.  Id.

Here, in contrast, there is evidence of coordination between Carter and HJC for limited charitable purposes, but the key elements of state involvement in and benefit from the challenged conduct—sexual harassment—are absent.  See Forbes, 2008 WL 3539936, at *7; see also Burton, 365 U.S. at 725 (noting that municipal authority had power to prohibit discrimination in its lease to restaurant).  Plaintiff proffers no case law analogous to the facts of the instant action that would support such a finding.  Moreover, any purported failure by HJC to address the alleged harassment after the fact does not retroactively render the alleged harassment a jointly-undertaken activity (cf. Pl. Mem. at 6-7), and, as previously noted, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action."  Sullivan, 526 U.S. at 52.

In sum, Plaintiff has failed to identify a genuine dispute of material fact that would preclude an award of summary judgment, instead premising her arguments on the mistaken belief that the determination of state action is a question of fact for the jury, rather than law for the Court.  (Pl. Mem. at 4-7.)  Even viewing the record evidence in the light most favorable to Plaintiff and drawing all inferences in her favor, the Court cannot find state action

from the record evidence proffered. Plaintiff's Section 1983 claim accordingly fails, and Carter is entitled to summary judgment dismissing this claim. (Complaint ¶¶ 442-62.)

Because the Court is granting Carter's motion for summary judgment on the sole federal claim asserted against him, there are no remaining federal claims of which the Court has original jurisdiction and, to the extent the Court is authorized to continue to exercise supplemental jurisdiction of any state or local claims asserted against Carter under 28 U.S.C. section 1367(a), it declines to do so. See Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); 28 U.S.C.A. § 1367(c) (Westlaw through P.L. 119-4) (providing that court may decline to exercise supplemental jurisdiction where, inter alia, the claim "substantially predominates over the claim or claims over which the district court has original jurisdiction" and where "the district court has dismissed all claims over which is has original jurisdiction"). Plaintiff's claims asserted under state and local law as against Carter are therefore dismissed without prejudice to litigation in forum of competent jurisdiction.

## CONCLUSION

For the foregoing reasons, Carter's motion is granted, and Plaintiff's remaining claims against Carter are dismissed. The Clerk of Court is respectfully directed to enter judgment accordingly.

All claims as against all defendants having been resolved, the Clerk of Court is further directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: New York, New York
      March 31, 2025

                                            /s/ Laura Taylor Swain
                                            LAURA TAYLOR SWAIN
                                            Chief United States District Judge